DART INDUSTRIES INC. and
Dart Holdings Inc.

v.

Larry A. CONRAD, Raymond Hafsten,
Theodore L. Sendak, and P. R.
Mallory & Co. Inc.

Civ. A. No. IP 78–709–C.

United States District Court,
S. D. Indiana,
Indianapolis Division.

Temporary Restraining Order and Order
to Show Cause Nov. 10, 1978.

Findings of Fact and Conclusions of
Law Nov. 17, 1978.

Final Judgment Nov. 17, 1978.

Memorandum Dec. 5, 1978.

Russel H. Beatie, Jr., Dewey, Ballantine, Bushby, Palmer & Wood, New York City, James B. Capehart and Harry Gonso, Bingham, Summers, Welsh & Spilman, Indianapolis, Ind., for plaintiffs.

Melvyn L. Cantor, New York City, James A. McDermott, James A. Strain, Robert H. Jerry, II, Barnes, Hickam, Pantzer & Boyd, Indianapolis, Ind., for defendant P. R. Mallory & Co. Inc.

Larry A. Conrad, Secretary of State, Raymond Hafsten, Securities Commissioner, Theodore L. Sendak, Atty. Gen. of Indiana, William G. Mundy, Asst. Atty. Gen., Indianapolis, Ind., for defendants.

## MEMORANDUM

Plaintiffs, Dart Industries Inc. and its subsidiary, Dart Holdings Inc., brought this action in connection with their efforts to take over defendant P. R. Mallory & Co. Inc. through a cash tender offer to Mallory's shareholders. This was an action for a declaratory judgment, pursuant to 28 U.S.C. § 2201 (1976), declaring the Indiana Business Take-Over Act, Ind.Code §§ 23–2–3–1 through 12, and the Delaware Tender Offers Act, Del.Code Ann., tit. 8, § 203, to be null and void on their face and as applied to plaintiffs because they are unconstitutional. Dart originally asked the Court to enjoin Mallory from invoking either the Indiana Act or the Delaware Act, and to enjoin the responsible Indiana officials, the Secretary of State, the Securities Commissioner, and the Attorney General of Indiana, from invoking the Indiana Act. This Court granted a temporary restraining order in favor of plaintiffs, and Mallory's attempt to overturn this order was rejected by the Seventh Circuit. The Indiana officials were later dismissed out and the final legal issues before the Court were whether the Delaware Act is unconstitutional because it is pre-empted by the Williams Act, 15 U.S.C. §§ 78m(d)–(e) and 78n(d)–(f) (1976), or because it is an impermissible burden on interstate commerce. This Court

held that the Delaware Act is unconstitutional as applied to the tender offer of plaintiffs under the facts of this case on both of those grounds and therefore granted plaintiffs' request for preliminary and permanent injunctive relief. The basis for the Court's holding is more fully set out in the Temporary Restraining Order and Order to Show Cause and the accompanying Findings of Fact and Conclusions of Law and Final Judgment.

## TEMPORARY RESTRAINING ORDER AND ORDER TO SHOW CAUSE

STECKLER, Chief Judge.

This matter having come before this Court upon the complaint of plaintiffs; the affidavit of Russel H. Beatie, Jr., sworn to on the 8th day of November, 1978, the affidavit of Russell K. Bolton, sworn to on the 8th day of November, 1978, and the arguments of the parties, by their respective counsel, on November 9, 1978, regarding the propriety of the issuance of a temporary restraining order, and the Court being duly advised in the premises that the plaintiffs' request for a temporary restraining order should be granted for the following reasons:

1. This Court has subject matter jurisdiction over the claims asserted in the complaint and personal jurisdiction over the parties herein; and

2. Venue is proper in this district; and

3. Plaintiffs, Dart Industries Inc. and Dart Holdings Inc., are corporations duly organized and existing under the laws of the State of Delaware; and

4. Dart Holdings Inc., a wholly-owned subsidiary of Dart Industries Inc., is proposing to make a tender offer to purchase any and all of the outstanding shares of the common stock of P. R. Mallory & Co. Inc. at Forty-six Dollars ($46.00) per share, a substantial premium of more than Sixteen Dollars ($16.00) per share; and

5. The proposed tender offer represents a transaction in interstate commerce of more than Two Hundred Ten Million Dollars ($210,000,000.00); and

6. The common stock of P. R. Mallory & Co. Inc. is registered with the Securities and Exchange Commission pursuant to Section 12(b) of the Securities Exchange Act of 1934 and is listed and traded on the New York Stock Exchange and Pacific Stock Exchange, which are national securities exchanges active in the national securities markets; and

7. P. R. Mallory & Co. Inc. presently has approximately Four Million Nine Hundred Thousand (4,900,000) shares of common stock issued and outstanding and has approximately Five Thousand (5,000) shareholders of record; and

8. The offer to purchase the common stock of P. R. Mallory & Co. Inc. will be made to all shareholders throughout the United States, not just to shareholders residing in Indiana; and

9. The tender offer for the common stock of P. R. Mallory & Co. Inc. is intended to comply with the timing requirements of the Williams Act provisions of the Securities Exchange Act of 1934 and Section 7A of the Clayton Act (Title II of the Hart-Scott-Rodino Antitrust Improvements Act of 1976); and

10. Pursuant to such statutes, Congress has determined that, for securities purposes, an appropriate period for such tender offers to be open is seven (7) days and that, for antitrust purposes, the offering period is fifteen (15) days, which periods of time were carefully considered by Congress when it balanced the interests of the shareholders receiving the offer, the orderly nature of the national securities markets, the incumbent management of the target company, and the offering company; and

11. The above-mentioned federal statutes would permit Dart Holdings Inc. to commence its offer immediately for any and all shares of P. R. Mallory & Co. Inc.; and

12. Section 23–2–3–1 et seq. of the Indiana Code (the "Indiana Business Take-Over Act") and Section 203 of the Delaware Code (collectively the "State Tender Offer Acts")

require pre-offer notification periods of twenty (20) days, require the tender offer to remain open for periods of time well beyond those required by federal law, and require burdensome and unnecessary disclosures, all of which were considered and rejeceted by Congress when it passed the Williams Act; and

13. The time periods embodied in the above-mentioned federal statutes have been drafted by Congress with a view to providing a fair balance between all parties to a tender offer, but their purpose would be defeated by application of the State Tender Offer Acts; and

14. In Order to effectuate the congressional purposes timing is critical; and

15. Denial of a Temporary Restraining Order against the State Tender Offer Acts would cause Dart Industries Inc. and Dart Holdings Inc. irreparable injury by depriving them of their federal statutory rights, by imposing on them lengthy delays and by exposing them to lengthy and expensive administrative proceedings; and

16. The Indiana Business Take-Over Act appears to be null and void on its face as applied to the above-mentioned tender offer because it violates the commerce clause of the Constitution of the United States and is preempted by the Williams Act provisions of the Securities Exchange Act of 1934; and

17. The application of Section 203 of the Delaware Code to the proposed tender offer would deprive plaintiffs of their federal statutory and constitutional rights by infringing the commerce clause of the United States Constitution and the supremacy clause in an area of law preempted by federal legislation; and

18. It appears to this Court that there is no good cause to deny plaintiffs' request for a Temporary Restraining Order at this time; and

19. It appears to this Court that plaintiffs have a reasonable likelihood of success on the merits of this action; and

20. The plaintiffs do not have an adequate remedy at law.

IT IS NOW, THEREFORE;

ORDERED that, pending the determination of plaintiffs' motion for preliminary injunction, defendants, their successors, officers, agents, servants, stockholders, and attorneys and all persons in active concert or participation with them be, and they are, restrained from invoking, applying, or enforcing the Indiana Business Take-Over Act or any orders, rules, or regulations issued pursuant to it, against plaintiffs or those acting on their behalf in connection with plaintiffs' proposed tender offer for the shares of P. R. Mallory & Co. Inc.; and it is further

ORDERED that, pending the determination of plaintiffs' motion for preliminary injunction, defendant P. R. Mallory & Co. Inc., its successors, officers, agents, servants, stockholders, and attorneys and all persons in active concert or participation with it be, and they are, restrained from invoking, applying, or enforcing the Delaware Tender Offers Act or any other state statute purporting to regulate the terms and conditions of interstate tender offers, against plaintiffs or those acting on their behalf in connection with plaintiffs' proposed tender offer for the shares of P. R. Mallory & Co. Inc.; and it is further

ORDERED that plaintiffs need post no bond as security for damages caused by the entry of this Order; and it is further

ORDERED that each of the defendants show cause before this Court on the 14th day of November, 1978, at 10:00 o'clock in the forenoon or as soon after that as counsel can be heard why an order should not be entered preliminarily enjoining:

(a) each of the defendants, their successors, officers, agents, servants, employees, stockholders, and attorneys, and all persons in active concert or participation with them from taking any action to invoke, apply, or enforce the Indiana Business Take-Over Act (Ind.Code §§ 23–2–3–1 to 12) or any orders, rules, or regulations issued pursuant to that Act against plaintiffs or those acting on their behalf in connection with plaintiffs' proposed tender offer for the shares of P. R. Mallory & Co. Inc.; and

**4**

(b) defendant P. R. Mallory & Co. Inc., its successors, officers, agents, servants, employees, stockholders, and attorneys, and all persons in active concert or participation with it from taking any action to invoke, apply, or enforce the Delaware Tender Offers Act (Del.Code Ann. tit. 8, § 203), or any other state statute purporting to regulate the terms and conditions of interstate tender offers, or any orders, rules, or regulations issued pursuant to that Act or those statutes against plaintiffs or those acting on their behalf in connection with plaintiffs' proposed tender offer for the shares of P. R. Mallory & Co. Inc.; and it is further

ORDERED that in accordance with Rule 65 of the Federal Rules of Civil Procedure the hearing on the Motion for Preliminary Injunction shall be consolidated with the hearing of the trial on the merits.

### FINDINGS OF FACT AND CONCLUSIONS OF LAW

The Court, having heard the evidence, reviewed the briefs, and heard counsel for the parties, enters, pursuant to Rule 52(a), Fed.R.Civ.P., its findings of fact and conclusions of law as follows:

### FINDINGS OF FACT

A. *The Parties*

1. Dart Industries Inc. ("Dart Industries") and Dart Holdings Inc. ("Dart Holdings") are corporations organized and existing under the laws of the State of Delaware, with their principal place of business in Los Angeles, California. Dart Holdings is a wholly-owned subsidiary of Dart Industries whose only present business is to make a tender offer for, and to hold shares of, P. R. Mallory & Co. Inc. ("Mallory"). Stipulation of November 14, 1978 ("Stip.") Par. 1.

2. Dart Industries was incorporated in 1928 as a successor to a business originally established in 1902. Presently, Dart Industries is a diversified company engaged in the manufacturing and marketing of consumer products, chemicals, plastics and packaging throughout the United States and in several foreign countries. Its prod-ucts are marketed directly to consumers in the home or through retail outlets, or indirectly through intermediate manufacturers and converters whose products are sold to consumers. Dart Industries also owns resort communities in California which include homesites, condominiums and recreational housing. Stip. Par. 2.

3. As presently constituted, Dart Industries is an enterprise of more than 40 operating divisions and approximately 31,000 employees, divided into four primary operating segments—Direct Selling, Consumer Products, Chemical Plastics and Glass Containers. Among Dart Industries' better known products are TUPPERWARE plastic containers for preparing, storing and serving food, WESTBEND cookware and electric housewares, and WILSON ART laminated plastics. Other products include plastic resins used in the manufacture of packaging materials and a variety of consumer products, glass containers and bottles for the packaging of foods and beverages, pollution control equipment and plastic cups, tubes and containers. Stip. Par. 3.

4. Dart Industries presently employs individuals in some 40 states and 30 foreign countries. Of the company's total operations, approximately 25% of sales and 39% of after-tax earnings in the year ended December 31, 1977, came from activities outside the United States. Stip. Par. 4.

5. For its fiscal year ended December 31, 1977, Dart Industries had net sales of $1.6 billion and net earnings after taxes of $109 million as compared with net sales of $1.47 billion and net earnings after taxes $101 million in 1976. Earnings per share (fully diluted) were $4.18 in 1977 and $3.88 in 1976. As of the end of fiscal 1977, Dart Industries had total assets in excess of $1.4 billion. Stip. Par. 5.

6. Dart Industries' securities are registered with the Securities and Exchange Commission (the "SEC") pursuant to Section 12(b) of the Securities Exchange Act of 1934 (the "Exchange Act"), 15 U.S.C. § 78*l* (b). Dart Industries is presently subject to the informational requirements of the Exchange Act and, in accordance therewith,

files reports and other information with the SEC relating to its business activities, financial statements and other matters. Stip. Par. 6.

7. Dart Industries is a publicly held company whose common stock is listed and traded on the New York Stock Exchange, the Boston Stock Exchange, and the Pacific Stock Exchange. As of December 31, 1977, Dart Industries had 23,202,323 shares of common stock outstanding, held by 28,789 shareholders of record throughout the United States and numerous foreign countries. Total stockholders' equity as of the end of the fiscal year 1977 was approximately $846 million. Stip. Par. 7.

8. As of August 2, 1978, 456 residents of Indiana held of record approximately 115,-500 shares of Dart Industries' common stock, representing approximately 0.5% of the total common shares issued and outstanding. As of August 2, 1978, 70 residents of Delaware held of record approximately 748,000 shares of Dart Industries' common stock, representing approximately 3.2% of the total common shares issued and outstanding. Stip. Par. 8.

9. Mallory, a publicly held corporation incorporated under the laws of the State of Delaware with its principal place of business in Indianapolis, Indiana, is a manufacturer and distributor of consumer replacement and DURACELL brand name high performance batteries, electromagnetic timers and other electrical controls, and capacitors. Mallory employs in excess of 11,000 persons in thirteen (13) states, including Indiana, and has operations in fourteen (14) foreign countries. For the fiscal year ending December 31, 1977, Mallory had net sales of $341,772,000, resulting in net earnings after taxes of $13,210,000 or $3.01 per share. For fiscal 1977, Mallory had assets of $230,777,000 and total shareholders' equity of $118,831,000. Stip. Par. 9.

10. Through its distributorships, Mallory markets its DURACELL brand name batteries in every state in the Union and in several foreign countries. During fiscal 1977, these battery sales made up most of Mallory's revenues, representing 60.7% of total sales and generating 79.8% of total operating profits. Stip. Par. 10.

11. Historically, Mallory's net earnings have fluctuated from $9.4 million in 1973 to $2 million in 1975 to $13.2 million in 1977. Net earnings per share have also varied from $2.44 in 1973 to $.52 in 1975 to $3.01 in 1977. For the twelve months ended September 30, 1978, Mallory's net earnings declined to $12.9 million or $2.84 per share. Stip. Par. 11.

12. Mallory's common stock shares and debentures are registered with the SEC pursuant to Section 12(b) of the Exchange Act. As of June 30, 1978, Mallory had 4,923,225 common shares outstanding. Mallory's shares are listed and traded on the New York Stock Exchange and the Pacific Stock Exchange. During 1977, the average daily volume of Mallory common stock was approximately 7,400 shares. Stip. Par. 12.

13. As of March 13, 1978, Mallory had 5,449 shareholders in most of the states of the Union and in several foreign countries. Institutional holders of Mallory's stock located in New York, Pittsburgh, Denver and elsewhere outside of Indiana possess in excess of 33% of the outstanding Mallory stock. Individuals and small institutions hold of record approximately 50% of Mallory's stock and are located in most of the states of the Union. Charitable institutions are also large holders of Mallory's stock. Twelve per cent of Mallory's stock is held by approximately 800 shareholders (representing approximately 16% of the Mallory shareholders) located in Indiana, the remainder being spread around the country with concentrations in the larger financial centers. Stip. Par. 13.

14. There is no evidence that Mallory has any shareholders in Delaware.

15. The market price of Mallory's stock of the New York Stock Exchange reached an all-time high of $45.875 in 1977 and was as low as $10.375 in 1974, its lowest level of the past five years. During 1978 the market price of Mallory stock has fluctuated from a high of $40.25 on September 12, 1978 to a low of $26.50 on November 3, 1978. On

November 8, 1978, Mallory's stock closed at $29.375. Stip. Par. 14.

16. Defendants Larry Conrad, Secretary of State of Indiana, Raymond Hafsten, Securities Commissioner of Indiana, and Theodore L. Sendak, Attorney General of Indiana (collectively the "Indiana defendants"), are charged with the enforcement and administration of Section 23–2–3–1 through 23–2–3–12 of the Indiana Code ("Indiana Business Take-Over Act").

### B. *The Tender Offer*

17. On November 9, 1978, Dart Holdings filed a Notification and Report Form with the Federal Trade Commission and the Antitrust Division of the United States Department of Justice pursuant to Section 7A of the Clayton Act, 15 U.S.C. § 18a, concerning a proposed tender offer by Dart Holdings for any and all of the common stock of Mallory. Complaint Par. 32.

18. On November 9, 1978, Dart Industries and Dart Holdings served upon Mallory, pursuant to Section 803.5(a)(1) of the Rules of the Federal Trade Commission under Section 7A of the Clayton Act, a notice in the form of a letter dated November 9, 1978, by R. K. Bolton, Vice President of Dart Industries. Stip. Par. 16.

19. On November 9, 1978, pursuant to Section 14(d)(1) of the Exchange Act, Dart Holdings served upon Mallory and filed with the SEC a Schedule 14D–1 concerning the proposed offer. Stip. Par. 15.

20. On November 9, 1978, Dart Holdings announced that it intended to make a tender for any and all outstanding shares of common stock of Mallory at $46 net per share, subject to the terms and conditions set forth in its proposed Offer to Purchase and related Letter of Transmittal, attached as exhibits to its Schedule 14D–1 and filed with the SEC. Complaint Par. 18.

21. On November 13, 1978, Dart Holdings served upon Mallory and filed with the SEC its Amendment No. 1 to its Schedule 14D–1. Stip. Par. 17.

22. On November 13, 1978, Dart Holdings commenced its offer to purchase the common stock of Mallory by publication in the *New York Times* and other newspapers.

### C. *Procedural History of this Action*

23. On November 9, 1978, plaintiffs brought this action seeking a declaratory judgment that the provisions of Sections 23–2–3–1 through and including 23–2–3–12 of the Indiana Code (the "Indiana Business Take-Over Act") and Section 203 of the Delaware Code Annotated (the "Delaware Tender Offers Act") (collectively, the "State Tender Offers Acts") are null and void on their face and as applied to plaintiffs, because they violate the Constitution of the United States and are pre-empted by the 1968 amendments to the Exchange Act known as the "Williams Act". 15 U.S.C. §§ 78m(d)–(e) and 78n(d)–(f). Complaint Par. 1.

24. Pursuant to Rule 65 of the Federal Rules of Civil Procedure, plaintiffs requested a temporary restraining order, a preliminary injunction, and a permanent injunction enjoining and restraining Indiana defendants Conrad, Hafsten and Sendak, and the officers, directors, and shareholders of Mallory from invoking or enforcing the State Tender Offer Acts against the plaintiffs, in connection with the plaintiffs' tender offer for any and all of the outstanding shares of common stock of the defendant Mallory. Complaint Par. 2.

25. On November 10, 1978, following notice to the defendants and hearings totalling approximately five hours at which all parties appeared by counsel and were heard, this Court, relying on the recent Fifth Circuit decision in *Great Western United Corp. v. Kidwell*, 577 F.2d 1256 (5th Cir. 1978), issued a temporary restraining order against the enforcement of the State Tender Offer Acts pending a hearing on plaintiffs' motion for preliminary injunction. This Court scheduled a hearing on plaintiffs' motion for a preliminary injunction for November 14, 1978, only two business days after entry of the temporary restraining order, such hearing to be consolidated with a hearing on plaintiffs' request for a permanent injunction.

26. On November 10, 1978, Mallory and the Indiana defendants filed Notices of Appeal from the temporary restraining order to the United States Court of Appeals for the Seventh Circuit. On November 12, 1978, Mallory, in addition, filed with the Seventh Circuit Court of Appeals a Petition for Writ of Mandamus or Prohibition, seeking to vacate the temporary restraining order. It also made a Motion for Stay Pending Appeal and Disposition of Petition for Writ of Mandamus.

27. On November 13, 1978, the Seventh Circuit issued its order dismissing the appeals for lack of jurisdiction and denying Mallory's Petition for Writ of Mandamus or Prohibition and its motion for a stay.

28. On November 14, 1978, defendant Conrad as Secretary of State and defendant Hafsten as Securities Commissioner issued an Order of Exemption, exempting Dart Holdings' tender offer for Mallory shares from all provisions of the Indiana Business Take-Over Act, effective November 9, 1978. The Order of Exemption stated, in part:

"The rationale for this exemption is based upon the principles of comity and federalism wherein the State of Indiana will defer to the State of Delaware and its laws in the matter herein. The interest of the State of Delaware is paramount to that of the State of Indiana—because P. R. Mallory is a Delaware corporation and Indiana's interest is that of principal place of business. Accordingly, in an effort to avoid duplications and unwarranted litigation the State of Indiana will defer to the laws of the State of Delaware as said laws pertain to the take-over offer by 'Dart' for 'Mallory'."

29. On November 14, 1978, the Indiana defendants moved for dismissal of this action as to them on the ground that, in view of the Order of Exemption, the claims against them had become moot. On the same date, there being no opposition, this Court granted that motion and dismissed the Complaint as to the Indiana defendants. As a consequence the Indiana Business Take-Over Act was eliminated from this action, and the Court took no further action relating to the Indiana Business Take-Over Act.

30. Pursuant to an informal request by the attorneys for Mallory, on November 13 and 14, 1978, plaintiffs produced for inspection and copying by Mallory all their files relating to the making of the tender offer. Transcript of Proceedings ("Tr.") Vol. I p. 82.

## D. The Events Leading Up to the Tender Offer

31. Over the last several years, Dart Industries accumulated a capital position of approximately $50–60 million per year so that, at the end of 1977, its cash resources were approximately $250 million and are expected to be approximately $300 million at the end of 1978. Tr. Vol. I p. 63.

32. As a result of this large accumulation of cash, which was maintained principally in certificates of deposit, treasury bills and other short to medium term instruments (Tr. Vol. I p. 78), Dart Industries had a corporate need for an alternative investment which would produce a greater return for its shareholders. It therefore determined to invest a substantial amount of capital in an outside business. Tr. Vol. I p. 63.

33. Among the candidates for acquisition considered by Dart Industries was Mallory, the financial statements of which were reviewed by Dart Industries in the first quarter of 1978. In August 1978 Mallory was viewed as a serious acquisition candidate, and Dart Industries asked its investment advisors to undertake an analysis. Tr. Vol. I pp. 100–102.

34. Four methods of approach were considered by Dart Industries: (a) friendly negotiations; (b) an investment program consisting of open market purchases; (c) an investment program coupled with preparation for a tender offer, with negotiations prior to the making of any tender offer; and (d) an investment program followed by the making of a tender offer, with negotiations to take place thereafter. Tr. Vol. I p. 64.

35. Although Dart Industries had a long-standing policy of acquisition only by friendly negotiations (Tr. Vol. I p. 65), its own recent experience suggested that friendly negotiations were not likely to lead to the acquisition of Mallory. Tr. Vol. I p. 104. Moreover, Dart Industries' investment advisors pointed out that, unless Dart Industries was willing to proceed unilaterally, its chances of success in acquiring Mallory were slim. Tr. Vol. I p. 66.

36. Dart Industries ultimately rejected the alternatives of an investment program or an investment program coupled with preparation for the making of a tender offer to be preceded by negotiations because, in either event, Dart Industries would have been required to make known its intention of gaining control of Mallory before actually making a tender offer. Tr. Vol. I pp. 67–68.

37. Dart Industries believed that pre-offer disclosure of its intentions, as well as the delays which could follow such disclosure because of the requirements of the State Tender Offer Acts, would seriously impair its chances of success in acquiring Mallory. Tr. Vol. I pp. 67–69.

38. Therefore, Dart Industries decided to make a tender offer without advance disclosure or negotiations, and, on November 6, 1978, the Dart Industries Board of Directors approved a proposed offer to acquire any and all shares of Mallory at a price of $46 per share net to the seller. Tr. Vol. I pp. 124–126.

E. *Expenses Incurred by Plaintiffs*

39. To date, plaintiffs have incurred out-of-pocket expenses of over $1 million as a result of fees owed to its investment advisors, legal fees and advertising and printing costs. To the extent this offer is delayed, these expenses will increase. Tr. Vol. I p. 74.

40. Plaintiffs have entered into revolving credit agreements with certain banks under which the banks have committed to make available to plaintiffs at a future date substantial cash funds in return for a percentage fee which amounts to approximately $1,500–2,000 per day. To the extent that plaintiffs are prevented from consummating this tender offer, plaintiffs must continue to pay this commitment fee and, accordingly, the total amount of fees paid under this revolving credit arrangement will increase. Tr. Vol. I pp. 74; 117.

41. Monetary resources available to plaintiffs which would be used to purchase shares tendered pursuant to this offer are required to be kept in a much more liquid state than would exist in the absence of this offer. As a result, Dart Industries has sacrificed higher returns on long term investments for lower returns on short term investments. To the extent that the completion of this offer is delayed, the amount of revenue lost as a result of the differential between long term and short term investments will increase. Tr. Vol. I pp. 74; 121.

42. Plaintiffs have made a large commitment over a nine-month period in management time and energy in studying and analyzing Mallory and attempting to consummate this offer. To the extent that completion or resolution of this offer is protracted, Dart Industries management—as well as Mallory management—will be required to spend time on activities which are not producing results for Dart Industries' consumer industry business. Tr. Vol. I pp. 74–75; 122–123.

43. Finally, to the extent that this offer is delayed, Dart Industries incurs an incalculable cost in that the risk of successfully completing this tender offer is increased. Tr. Vol. I pp. 75; 123.

F. *Analysis of a Tender Offer*

44. A tender offer plays an important role in the health of the national economy in that it serves as a device which helps to maintain accountability of corporate management to its shareholders. Through this device—whereby the shareholder of a target corporation is offered a premium price to sell his shares to the offering corporation—the shareholders are given a chance to remove inefficient or sluggish management from office. More importantly, the

existence of tender offers cause management of all companies to live with the knowledge that a tender offer might be made unless management is receptive to shareholder desires and their performance is satisfactory. Tr. Vol. II pp. 164–165. This finding relates solely to tender offers in general, and no evidence was submitted that suggested that the corporate management of Mallory performed in any way other than effectively. By the Court's finding it is not intended in any way to suggest the contrary.

45. In order for any tender offer to be successful, the shareholder of a target company must be given a benefit which is sufficiently valuable to induce him to tender his stock. Accordingly, tender offers are generally made at a premium—*i. e.*, a price above the prevailing market price—in order to encourage tendering of the shares.

46. The success of any public tender offer depends largely upon the activities of arbitrageurs. These are professional risk takers who offer the target shareholders an opportunity to sell their shares on the market at a premium over the pre-tender offer market prices during the pendency of an offer. In this fashion, the arbitrageurs assume the risks inherent in any tender offer that the offer will not ultimately be withdrawn. Tr. Vol. II p. 176.

47. To the extent that the market (in which the arbitrageurs participate) perceives the risk of successfully completing the offer as minimal, the shareholders can obtain a price for their shares which approximates the price they would have received had the shares been tendered pursuant to the offer. Tr. Vol. II p. 176.

48. The single most effective weapon a target company may utilize to defeat a tender offer is delay. *See Great Western United Corp., supra*, 577 F.2d at 1278. *See also* Securities Exchange Act Release No. 15230, October 13, 1978, Fed.Sec.L.Rep. (CCH), Paragraph 81,748 at 80,985.

49. While there are plausible arguments submitted by the defendants, the Court finds that delay increases the risks that the offer will not be successful by, among other things, granting time to incumbent management to take various steps in an effort to frustrate the successful completion of the tender offer. For example, (a) incumbent management may attempt to acquire shares of the target's stock on the market place; (b) incumbent management may issue additional shares, thereby affecting the number of shares the offeror must acquire to obtain control; (c) the target company may acquire companies or assets of companies which can make the target unpalatable to the offeror; (d) the target company may enter into long term employment contracts with management; (e) the target company may negotiate loan agreements providing that the loan is callable upon a change in control of the target company; (f) the target company may declare a dividend or stock split which can increase the market price of the target's stock; (g) the target company may adopt amendments to corporate by-laws which create impediments to obtaining control by the offeror; or (h) incumbent management may commence litigation in an effort to halt the offer. Tr. Vol. II. pp. 228–230.

50. Although delay may, in some instances, result in an increase in the price offered to shareholders by encouraging an "auction market" in which a competing offeror offers a higher price or the original offeror raises the price he offers, a higher price is by no means a necessary consequence of delay.

51. The prospect of delay and the risks and uncertainties it creates has a tendency to cause offerors to make their original offer at a lower price than would be offered if there were a reasonable anticipation that the tender offer could be speedily completed. Thus, if there is no competing bid or other impetus for an increase in price during the pendency of an offer, the shareholders are disadvantaged. Tr. Vol. II p. 260.

52. Moreover, to the extent that there exists a risk that the offer will be delayed or not successfully completed, arbitrageurs, in assuming that risk, lower the price they are willing to pay shareholders. Tr. Vol. II pp. 175–176.

53. The risk and uncertainty created by delay have a chilling effect in that they discourage the making of tender offers, which also serves as a disadvantage to shareholders. Tr. Vol. II p. 177.

54. In this case, the Mallory Board of Directors met, reviewed the offer and made a recommendation to shareholders with respect to it only one day after the offer was made and only five days after Dart Holdings' intention to make the offer was announced. It is apparent, therefore, that target company management can evaluate a tender offer and formulate a recommendation regarding it in a very short period of time and that neither pre-offer periods of delay nor prolongation of the offer period itself is mandatory or necessary to equip a target company to evaluate the offer.

55. Proxy solicitors retained by target company management communicate with both large and small shareholders by telephone. They can, therefore, disseminate information and management recommendations to shareholders quickly and in a short period of time.

56. Tender offers for shares traded on national securities exchanges are commercial transactions taking place in a national market. There is thus a need for national, rather than local, regulation.

## G. The Delaware Tender Offers Act

57. The Delaware Tender Offers Act was enacted on May 1, 1976. It was intended to regulate and does in fact regulate interstate tender offers if the target company is incorporated in Delaware. Del. Code Ann. tit. 8, Sec. 203(c)(2).

58. The Delaware Tender Offers Act provides, among other things:

(a) Notice to the target company, but not to its shareholders, a minimum of 20 days prior to the making of a tender offer, (Del.Code Ann. tit. 8, Sec. 203(a)(1));

(b) A-20-day waiting period prior to the making of a tender offer, (Del.Code Ann. tit. 8, Sec. 203(a)(1));

(c) The disclosure of immaterial financial information which is generally publicly available, such as income statements for the three fiscal years preceding the offer, (Del.Code Ann. tit. 8, Sec. 203(a)(1));

(d) A requirement that a tender offer remain open for at least 20 days. (Del. Code Ann. tit. 8, Sec. 203(a)(2) and(a)(3));

(e) Provisions for withdrawal and proration rights during the full period of the offer, (Del.Code Ann. tit. 8, Sec. 203(a)(2)–(3));

(f) Provisions allowing a potential target company to exempt a tender offer from operation of the Delaware Tender Offers Act by an appropriate charter provision, (Del.Code Ann. tit. 8, Sec. 203(d));

(g) Provisions discriminating against original offerors by allowing subsequent or competing offerors to purchase securities tendered pursuant to their competing tender offers at the same time the original offeror is permitted to purchase, notwithstanding the fact that the subsequent offerors have not complied with the waiting period requirements applicable to original offerors, (Del.Code Ann. tit. 8, Sec. 203(b)(1)).

59. The provisions of the Delaware Tender Offers Act set forth in paragraph 58 have the purpose and effect of delaying a tender offer, thereby introducing increased uncertainty into the market place as to whether the offer will succeed. Tr. Vol. II, p. 177.

60. The increased uncertainty caused by the Delaware Tender Offers Act increases the risk on the offeror and the arbitrageurs that the offer will not succeed with the result that:

(a) An offeror anticipating a battle during delay might deliberately make a low initial offer so that it can raise its offer to meet that of a competitor;

(b) A potential offeror might be discouraged from ever making an offer;

(c) Arbitrageurs will assign a greater risk factor to the offer and purchase shares from shareholders who sell on the market at lower prices than would prevail had the degree of risk and uncertainty

introduced by the state act not been present;

(d) The burden upon the offeror is increased with the risk that the offer may be unsuccessful and all expenses incurred in connection with the analysis and making of the offer will be lost.

### H. *Impact on Interstate Commerce*

61. The Delaware Tender Offers Act is extraterritorial in purpose and effect and thus causes an extraterritorial impact on interstate commerce by changing the time when, if ever, non-Delaware securities sales will occur, and altering the disclosure made in securities transactions occurring between Delaware and another state, two other states or even entirely within another state.

62. The Delaware Tender Offers Act would apply to all shareholders residing anywhere in the world.

63. Numerous large, publicly-held corporations have chosen to incorporate in Delaware. Indeed, well over 100 of the "Fortune 500" industrial corporations are Delaware corporations. The impact of the Delaware Tender Offers Act on interstate commerce is thus likely to be greater than the tender offer statute of any other state.

64. Application of the Delaware Tender Offers Act to Dart Holdings' offer for Mallory shares would delay an interstate tender offer that would otherwise have gone forward immediately for at least 20 days. This delay has the substantial impact on interstate commerce of stopping over $215 million of interstate commerce and thereby interrupting the free flow of interstate commerce.

65. Delaware has little reason to protect shareholders of other states if their securities transactions do not occur within Delaware.

66. Delaware has no interest in protecting resident management or in fostering such contribution as resident management may make to the life of the community, inasmuch as Mallory's top management resides in Indiana, where Mallory maintains its principal place of business.

### I. *Harm to Plaintiffs*

67. If Dart Holdings is required to comply with the provisions of the Delaware Tender Offers Act, the offer cannot go forward as presently announced and constituted. Instead, Dart Holdings will be required, among other things, to terminate its present offer, to give notice to Mallory of its intention to make the offer, to wait 20 days before commencing the offer, and thereafter to hold the offer open for an additional 20 days—all of which will subject Dart Holdings to substantial additional expense and to a greatly increased risk that the offer will ultimately not be successful.

68. Thus, if Dart Holdings is required to comply with the Delaware Tender Offers Act, plaintiffs will have been deprived of a substantial federal right—the right to engage in interstate commerce by the making of a cash tender offer in compliance with federal law governing such offers. The balance of risks among the tender offeror, the target company and the shareholders will have been tipped by operation of this statute so as to impose burdens upon plaintiffs which they would otherwise not have to bear. Tr. Vol. II, pp. 178–180.

69. Plaintiffs have already incurred substantial expenses in connection with the offer for Mallory common shares. If Dart Holdings is required to comply with the Delaware Tender Offers Act, much of the expense heretofore incurred by plaintiffs will have been irretrievably lost. In addition, further substantial expenses will be incurred, which in the event the risks created by compliance with the Delaware Tender Offers Act come to fruition and cause the defeat of the offer, are unlikely ever to be recovered or recompensed.

70. Moreover, plaintiffs have a corporate need for expansion by acquisition. If Dart Holdings is required to comply with the Delaware Tender Offers Act and if the delays imposed by that Act result in defeat of the offer, plaintiffs will have forever lost the opportunity to acquire Mallory, upon which so much study, time and expenditure of money has been concentrated. Even if

the offer is ultimately successful but is nonetheless subject to prolongation because of the Delaware Tender Offers Act, plaintiffs will have lost other corporate opportunities for alternative investments, and this certainly will be the case if the offer proves unsuccessful because of the delays.

## CONCLUSIONS OF LAW

### A. *The Williams Act*

71. In 1968, Congress enacted the Williams Act amendments to the Securities Exchange Act of 1934 to regulate tender offers involving the large interstate securities transactions and purchases of securities of corporations under the regulation of the SEC. 15 U.S.C. §§ 78m(d)–(e), 78n(d)–(f).

72. In enacting the Williams Act, Congress recognized that tender offers serve beneficial economic functions by, among other things, providing investors with an opportunity to sell their shares at advantageous premiums over prevailing market prices.

73. The language of the Williams Act and its legislative history demonstrate the intent of Congress that, when an interstate offer is made for the shares of a public corporation, its success or failure should be left to the free and informed investment judgment of the shareholders of that corporation.

74. Senator Williams, a sponsor of the bill and Chairman of the Senate Subcommittee on Securities which recommended adoption of the Williams Act, clearly explained Congress' intention not to favor either side in a tender offer:

"The committee has taken extreme care to avoid tipping the balance of regulation either in favor of management or in favor of the person making the takeover bid. The [Williams Act] is designed to require full and fair disclosure for the benefit of investors while at the same time providing the offeror and management equal opportunity to fairly present their case." 113 Cong.Rec. 24664 (1967).

75. In developing a legislative scheme which would favor neither the offeror nor incumbent management, Congress specifically intended to avoid creating devices for lengthy delays which would give incumbent management time to utilize mechanisms to defeat the tender offer, thereby depriving shareholders of the target corporation of the choice that cash tender offers give them. 122 Cong.Rec. 10293 (1976).

76. Thus, Congress specifically rejected proposals which had sought to impede cash tender offers, such as requiring offerors to give 20 days' advance notice to the target company before the tender offer would become effective. S.Rep.No.550, 90th Cong., 1st Sess. 4 (1967).

77. For the protection of investors, the Williams Act requires that they be given information which Congress has judged to be material for an intelligent determination to sell their securities for a cash premium or to hold them.

78. Accordingly, the Williams Act is designed not to defeat or discourage tender offers but to establish even-handed regulation which favors neither the offeror nor incumbent management of the corporation whose securities are being purchased. The provisions of the Williams Act represent a comprehensive, even-handed Congressional scheme which regulates the entire field of cash tender offers.

### B. *Preemption of the Delaware Tender Offers Act*

79. The Supremacy Clause of the Constitution prohibits the frustration of Congressional will by state legislation. *Ray v. Atlantic Richfield Co.,* 435 U.S. 151, 98 S.Ct. 988, 55 L.Ed.2d 179 (1978); *Jones v. Rath Packing Co.,* 430 U.S. 519, 97 S.Ct. 1305, 51 L.Ed.2d 604 (1977). This principle is restated in the Securities Exchange Act of 1934. 15 U.S.C. § 78bb(a). *See* also *Great Western United, supra,* 577 F.2d at 1272.

80. Here, the Delaware Tender Offers Act clearly contravenes the purpose and spirit of the Williams Act. It upsets the carefully balanced neutrality of the federal provisions by providing, contrary to the con-

gressional scheme, substantial advantages to incumbent management's efforts to defeat or delay a tender offer.

81. Moreover, in the context of this tender offer the Delaware Tender Offers Act specifically conflicts with the provisions of the Williams Act, by:

(a) requiring 20–60 days pre-offer notification, among other things, to target companies, which Congress expressly rejected, (Del.Code Ann. tit. 8, Sec. 203(1)(a));

(b) prescribing pre-offer waiting periods of 20–60 days after notification, which Congress expressly rejected, (Del. Code Ann. tit. 8, Sec. 203(a)(1));

(c) requiring the tender offer to remain open for at least 20 days, (Del.Code Ann. tit. 8, Sec. 203(a)(2)), whereas the Williams Act establishes a period of 7 or 10 days, (15 U.S.C. Sec. 78n(d)(5) and (6));

(d) providing for the withdrawal of shares by the tendering shareholders at any time during the pendency of the offer (Del.Code Ann. tit. 8, Sec. 203(a)(2)), whereas under the Williams Act tendered securities may be withdrawn only within seven days after the offer is first published or at any time after 60 days, (15 U.S.C. Section 78n(d)(5));

(e) allowing proration rights to extend during the entire duration of the tender offer (Del.Code Ann. tit. 8, Sec. 203(a)(3)), whereas the Williams Act pro rata period extends only to shares tendered within 10 days after the first publication, unless there is a subsequent increase in consideration, in which case an additional seven days is applied, (15 U.S.C. Section 78n(d)(6));

(f) requiring that the target company be provided with additional information with respect to the financial condition and history of the offeror, beyond the requirements of the Williams Act, (Del. Code Ann. tit. 8, Sec. 203(a)(1)); and

(g) discriminating against original offers by allowing subsequent or competing offerors to purchase the securities tendered pursuant to their competing tender offer at the same time the original offer-

or is permitted to purchase, notwithstanding the fact that subsequent offerors have not complied with the waiting period requirement applicable to original offerors (Del.Code Ann. tit. 8, Sec. 203(b)(1)).

82. In the present tender offer the Delaware Tender Offers Act is inconsistent with the Williams Act and "stands as an obstacle to the accomplishment and execution of the full purposes and objectives" of the Williams Act and accordingly under the Supremacy Clause is unconstitutional as applied to this tender offer. *Jones, supra,* 430 U.S. at 540–541, 97 S.Ct. 1305, 1309; *Hanes v. Davidowitz,* 312 U.S. 52, 67 (1941); *Great Western United, supra,* 577 F.2d at 1275.

C. *The Delaware Tender Offers Act Violates the Commerce Clause of the Constitution*

83. The Delaware Tender Offers Act is clearly extraterritorial in its application to this tender offer, as it applies to:

"[A]ny offer to purchase or invitation to tender equity securities for purchase made by an offeror to more than 30 of the holders of equity securities of any corporation organized under [Delaware Law] . . .." Del.Code Ann. tit. 8, Sec. 203(c)(2).

84. The power to regulate interstate commerce is a federal power, vested by the Constitution in Congress, Article I, Section 8 of the United States Constitution.

85. A statute affecting interstate commerce would be valid under the Commerce Clause "where the statute regulates evenhandedly to effectuate a legitimate local public interest, and its effects on interstate commerce are only incidental, . . . unless the burden imposed on such commerce is clearly excessive in relation to the putative local benefits . . . [citations omitted]." *Pike v. Bruce Church Inc.,* 397 U.S. 137, 142, 90 S.Ct. 844, 847, 25 L.Ed.2d 174 (1970); *Great Western United, supra,* 577 F.2d at 1282.

86. The Delaware Tender Offers Act fails in this tender offer to serve any local

interest that would justify its impact on interstate commerce, nor does it serve any local interest in benevolent, community-oriented management, as it applies to Mallory which does little more than maintain a registered agent in Delaware.

87. In its application to this tender offer, the Delaware Tender Offers Act significantly burdens interstate commerce by disrupting the normal securities market. *Great Western United, supra,* 577 F.2d at 1283. Its enforcement would prevent an offer that would affect over $215 million in interstate commerce. Defendant Exhibit H, paragraph 27.

88. In view of the minimal legitimate interests of Delaware here and the substantial burden imposed on interstate commerce, the Delaware Tender Offers Act cannot be sustained under the Commerce Clause. It is, accordingly, invalid and unenforceable as it is applied to this tender offer.

### Appropriate Relief

89. If required to comply with the unconstitutional Delaware Tender Offers Act, plaintiffs will suffer irreparable injury.

90. Accordingly, plaintiffs' request for preliminary and permanent injunctive relief precluding Mallory, its officers, directors, shareholders, and others from invoking or enforcing the Delaware Tender Offers Act in connection with plaintiffs' tender offer is granted.

91. Plaintiffs' request for a judgment declaring the Delaware Tender Offers Act null and void as applied to plaintiffs is also granted. Judgment shall be submitted accordingly.

### FINAL JUDGMENT

This action having come before the Court upon the complaint of plaintiffs Dart Industries Inc. and Dart Holdings Inc., filed with this Court on November 9, 1978, having come for trial before the Honorable William E. Steckler, District Court Judge for the Southern District of Indiana, presiding, on November 14, 1978, plaintiffs' action against defendants Larry Conrad, Secretary of State of the State of Indiana, Raymond Hafsten, Securities Commissioner for the State of Indiana, and Theodore L. Sendak, Attorney General for the State of Indiana, having been dismissed by Order of this Court on November 14, 1978, on the basis of mootness in that defendants Conrad and Hafsten had granted an Order exempting plaintiffs' tender offer for any and all of the outstanding common stock of P. R. Mallory & Co. Inc. ("Mallory") from the provisions of the Indiana Business Take-Over Act, Ind.Code § 23–2–3–1, *et seq.,* said Order granting such exemption having been approved by this Court on November 14, 1978, the evidence adduced by the parties having been heard and considered by this Court, and the Court having made its Findings of Fact and Conclusions of Law, it is hereby

ORDERED, ADJUDGED AND DECREED that the rights and obligations of the parties are as follows:

1. Section 203 of the Delaware Tender Offers Act, Del.Code Ann. tit. 8, § 203, *et seq.* (hereinafter referred to as the "Act") is unconstitutional and in violation of the Supremacy Clause of the United States Constitution, Article I, Section 8, and the Commerce Clause of the United States Constitution, Article I, Section 8, as applied to the tender offer of plaintiffs for any and all of the outstanding common stock of Mallory.

2. The Act is preempted by the Williams Act amendments to the Securities Exchange Act of 1934, 15 U.S.C. §§ 78m(d)–(e) and 78n(d)–(f), as applied to the tender offer of plaintiffs for any and all the outstanding common stock of Mallory.

3. Plaintiffs may continue and proceed with their tender offer for any and all the outstanding common stock of Mallory without compliance with the Act.

4. Pursuant to the provisions of Rule 65 of the Federal Rules of Civil Procedure, Mallory, its successors, officers, agents, servants, employees, and stockholders, and all persons in active concert or participation with it are hereby preliminarily and perma-

nently enjoined from taking any action to invoke, apply or enforce the Act or any orders, rules, or regulations issued pursuant to the Act against plaintiffs or those acting on their behalf in connection with plaintiffs' tender offer for any and all of the outstanding common stock of Mallory.