NATIONAL CITY LINES, INC.,
Appellee,

v.

LLC CORPORATION, Joseph Schoeberl, Commissioner of the Securities Division of the State of Missouri, and Donald Ainsworth, Director of the Division of Insurance of the State of Missouri, Appellants.

Nos. 81–2044, 81–2074, 81–2193, 81–2356 and 82–1212.

United States Court of Appeals, Eighth Circuit.

Submitted Nov. 11, 1981.

Decided Aug. 17, 1982.

Kaye, Scholer, Fierman, Hays & Handler, New York City, for amici curiae AGO Holding N. V. and AGO International B. V.

John Ashcroft, Atty. Gen., B. J. Jones, Asst. Atty. Gen., Jefferson City, Mo., for appellants Ainsworth and Schoeberl.

Husch, Eppenberger, Donohue, Elson & Cornfeld, St. Louis, Mo., Bartlett, Venters & Pletz, P. C., Jefferson City, Mo., for appellants.

Jeffrey S. Davidson, Nancy E. Hollingsworth, Kirkland & Ellis, Washington, D. C., Kenneth R. Heineman, Walter O. Theiss, Coburn, Croft & Putzell, St. Louis, Mo., for appellee National City Lines, Inc.

Before HENLEY,* McMILLIAN and ARNOLD, Circuit Judges.

McMILLIAN, Circuit Judge.

LLC Corporation (LLC)[1] and the State of Missouri appeal from two preliminary injunctions entered in the District Court for the Western District of Missouri[2] enjoining them from enforcing specific provisions of the Missouri Takeover Bid Disclosure Act (Takeover Act), Mo.Rev.Stat. § 409.500 *et seq.*, and the Missouri Insurance Holding Companies Act (Insurance Act), Mo.Rev. Stat. § 382.010 *et seq.*, against National City Lines, Inc. (National) in hotly contested tender offer and proxy solicitation battles. The district court found that the challenged provisions, as applied to National, were unconstitutional under the Suprema-

---

* The Honorable J. Smith Henley assumed senior status on June 1, 1982.

1. On August 2, 1982, National City Lines (National) and LLC Corporation (LLC), pursuant to Fed.R.App.P. 42(b), filed a stipulation of dismissal of the appeals initiated by LLC. We hereby dismiss with prejudice appeals numbered 81–2044, 81–2193 and 82–1212 in accordance with the stipulation of dismissal.

The dismissal of the above-named appeals does not dispose of the case because the state appellants, Joseph Schoeberl, Commissioner of the Securities Division of the State of Missouri, and Donald Ainsworth, Director of the Division of Insurance of the State of Missouri, have not dismissed their appeals numbered 81–2356 and 81·2074. From hereon the term "appellant" refers to Schoeberl and Ainsworth.

At the outset we note that this court entered three interim orders in LLC's appeals (October 9, 1981 in appeal numbered 81–2044, November 12, 1981 in appeal numbered 81–2193, and February 16, 1982 in appeal numbered 82–1212). On June 4, 1982, upon joint motion of National and LLC, this court vacated the above-named orders so that National, LLC, and their various officers and directors could execute proposed settlement agreements which had been presented to the court. Vacation of the orders was contingent upon a new order entered June 4, 1982, in the state's appeals numbered 81–2074 and 81–2356.

2. The Honorable Scott O. Wright, United States District Judge for the Western District of Missouri.

cy, Commerce and Full Faith and Credit Clauses of the United States Constitution.

For reversal appellants argue that the district court erred in finding that (1) the challenged provisions of the state acts conflict with and are preempted by the Securities Exchange Act of 1934, 15 U.S.C. § 78c *et seq.* (1976), as amended by the Williams Act; (2) the same provisions violate the Commerce Clause; and (3) the McCarran-Ferguson Act, 15 U.S.C. § 1012, did not preclude federal preemption of the Insurance Act.[3] Appellants also raise the issue of federal court deference to state proceedings under the *Pullman* and *Younger* abstention doctrines and the Anti-Injunction Act, 28 U.S.C. § 2283. We conclude that we are not precluded by these abstention doctrines from granting relief. We affirm the district court's judgment on the basis that the challenged provisions of the Takeover Act are invalid under the Supremacy and Commerce Clauses and that the Insurance Act is inapplicable on its face to National's tender offer and proxy solicitation. Therefore, we do not reach National's constitutional challenges to the Insurance Act.

## I. BACKGROUND

### A. *Tender Offer*

The facts, though lengthy, are not in dispute. National is a Delaware corporation engaged in the businesses of trucking, truck terminal leasing, and energy and real estate developments. LLC is a Delaware corporation with subsidiaries engaged in the businesses of convenience food, credit insurance and finance.[4] One of its subsidiaries, Personal Life Insurance Company (Personal), is organized and operated under the insurance laws of Missouri.[5]

On September 8, 1981, National announced its intention to make a cash tender offer for any or all shares of LLC common stock. On that same day, National filed a complaint in federal district court seeking to invalidate and enjoin enforcement of several provisions of the Missouri Takeover Act on the basis that they violated the Supremacy and Commerce Clauses of the Constitution.

A hearing was held on September 9, 1981, before Judge Elmo B. Hunter. Judge Hunter indicated his intention to transfer the case to Judge Scott O. Wright and deferred issuing a temporary restraining order after securing the parties' commitment to maintain the status quo. The hearing before Judge Wright was set for September 11, 1981.

On September 10, 1981, the General Counsel of Missouri's Division of Insurance advised National that he believed the Insurance Act was applicable to the tender offer because LLC held securities of Personal, a domestic insurer.

On September 11, 1981, Personal filed a complaint in state court based on the Insurance Act. Judge Byron Kinder issued an *ex parte* temporary restraining order forbidding National from completing its tender offer until it complied with the Insurance Act. A hearing on a preliminary injunction was set for September 24, 1981.

Also on September 11, 1981, National filed an amended complaint in federal district court seeking to invalidate and enjoin enforcement of specific provisions of the Insurance Act for the same reasons it alleged in its challenge to the Takeover Act. The district court entered a temporary restraining order (TRO) declaring the Takeover and Insurance Acts unconstitutional as applied to National's tender offer and temporarily restraining LLC, the state's securities director and insurance commissioner from enforcing either Act against National.

---

**3.** Appellants contest the full faith and credit ground for invalidating the Insurance Act for the first time on appeal. However, we need not reach this issue in view of our holding that the Insurance Act does not apply.

**4.** When the present case was filed, National's parent company, Contran, owned nearly thirty percent of LLC's outstanding stock, making it LLC's largest shareholder. In addition, three of National's officers were serving on LLC's Board of Directors when the present case was filed. More recently percentages of stock ownership as well as Board membership may have changed to some extent.

**5.** Personal sells life and disability insurance to persons given loans by other LLC subsidiaries.

A hearing on the preliminary injunction was set for September 29, 1981.

On September 14, 1981, National commenced its tender offer by filing a Schedule 14D–1 with the Securities and Exchange Commission (SEC) pursuant to § 14(d)(1) of the Williams Act and Regulation 14D promulgated thereunder. The offer was scheduled to expire on October 9, 1981.

On September 28, 1981, the state court granted LLC's motion for a preliminary injunction and enjoined National from purchasing tendered shares until it complied with the Insurance Act. The court limited its order by inserting, "except to the extent that such relief is precluded by a then presently outstanding order of either the United States District Court . . ., the Eighth Circuit or the United States Supreme Court." *Personal Life Insurance Co. v. National City Lines, Inc.*, No. CV181–734CC (Mo.Cir.Ct. Sept. 28, 1981), slip op. at 5. The court also expressly abstained from considering National's constitutional challenges to the Act. *Id.*

On September 30, 1981, the district court granted National's motion for a preliminary injunction declaring that the challenged provisions of the state acts conflicted with and were preempted by the Williams Act. The court, however, stayed National's right to commence purchasing tendered shares until midnight October 6, 1981. *National City Lines, Inc. v. LLC Corp.*, 524 F.Supp. 906 (W.D.Mo.1981).

On October 9, 1981, this court denied LLC's request for a continuance of the district court's stay pending appeal, thereby permitting National to purchase tendered shares. However, we enjoined National's voting of those shares pending appeal. We also enjoined LLC from disposing of any corporate assets other than in the ordinary course of business pending appeal. *National City Lines, Inc. v. LLC Corp.*, No. 81–2044 (8th Cir. Oct. 9, 1981).

National subsequently extended its tender offer until October 23, 1981, at which time it announced that the offer had not been successful. The record does not indicate whether National intends to make another tender offer for LLC's shares. Nevertheless, National faces both criminal and civil liability under state laws for making its September 14, 1981, offer without first complying with the Takeover Act, Mo. Rev.Stat. §§ 409.540, 409.545, and the Insurance Act, Mo.Rev.Stat. §§ 382.270, 382.-290. Therefore, the issues relating to National's tender offer are not moot.

### B. *Proxy Solicitation*

The progression of litigation surrounding National's proxy solicitation is analogous to that of its tender offer. On September 11, 1981, National announced its intention to consider soliciting proxies to vote at LLC's annual meeting which was scheduled to be held on November 17, 1981. The purpose of the meeting was to elect eight directors. On October 27, 1981,[6] National filed preliminary copies of its proxy solicitation materials with the SEC. The following day it filed a Schedule 14B with the SEC and the New York Stock Exchange. Pursuant to the applicable SEC rules, National could distribute its proxy materials ten days after the preliminary filing, SEC Rule 14a–6(c), 17 C.F.R. § 240.14a–6(a), and could commence soliciting proxies five days after filing its Schedule 14B, SEC Rule 14a–11(c)(1), 17 C.F.R. § 240.14a–11(c)(1).

On October 30, 1981, LLC, through its subsidiary Personal, obtained a TRO in state court restraining National's distribution and solicitation of proxy materials until it complied with the Insurance Act. The order was limited, however, by the proviso that the TRO applied "unless pre-empted by federal order or decree." *Personal Life Insurance Co. v. National City Lines, Inc.*, No. CV181–890CC (Mo.Cir.Ct. Oct. 30, 1981), slip op. at 1.

On November 2, 1981, National amended its complaint in federal district court alleging that the federal proxy rules preempted the Insurance Act. The following day the district court issued a preliminary injunction declaring specific provisions of the Insurance Act unconstitutional as applied to

---

**6.** Challenges to National's proxy solicitation were based on the Insurance Act because Missouri's Takeover Act applies only to tender offers.

National's proxy solicitation and enjoining enforcement of the Act against National's proxy solicitation. *National City Lines, Inc. v. LLC Corp.*, No. 81–4183–CV–C–W (W.D.Mo. Nov. 3, 1981). National distributed its proxy solicitation materials to LLC shareholders on November 9, 1981.

On November 5, 1981, this court denied LLC's motion for stay of the second preliminary injunction, thereby permitting National's proxy solicitation to go forward. However, we enjoined National's use of those proxies pending appeal. *National City Lines, Inc. v. LLC Corp.*, No. 81–2193 (8th Cir. Nov. 5, 1981).

## II. ABSTENTION

### A. *Pullman Abstention*

Appellants argue that the district court should have abstained from deciding National's motions for preliminary injunctive relief under the doctrine of *Railroad Commission of Texas v. Pullman Co.*, 312 U.S. 496, 61 S.Ct. 643, 85 L.Ed. 971 (1941) (*Pullman*). We review this contention by inquiring whether the district court abused its discretion in declining to abstain. *See Harman v. Forssenius*, 380 U.S. 528, 85 S.Ct. 1177, 14 L.Ed.2d 50 (1965).

Appellants state that the Director's and Commissioner's interpretation of the Insurance and Takeover Acts harmonize the state acts with the Williams Act so as to remove any possible conflict. Therefore, they reason, this is an appropriate case for *Pullman* abstention.

 We disagree. *Pullman* abstention presupposes two conditions: (1) there must be an unsettled issue of state law, and (2) there must be a possibility that the state law determination will moot the federal constitutional question raised. *See Kennecott Corp. v. Smith*, 637 F.2d 181, 184 (3d Cir. 1980); *Coley v. Clinton*, 635 F.2d 1364, 1373 (8th Cir. 1980). Neither condition exists here. The challenged provisions of the state acts are clear on their face and not susceptible of being construed in a way that would render it unnecessary to examine their impact on the purposes of the Williams Act. More importantly, appellants sought to apply these acts as written and rejected National's suggestions to harmonize the Insurance Act with the Williams Act.[7] *See* Supplemental Brief of Donald Ainsworth at 8–9. Therefore, the present case does not involve an ambiguous or unsettled question of law, and for that reason *Pullman* does not apply to this case. *See Kennecott Corp. v. Smith*, 637 F.2d 181.

### B. *Younger Abstention*

Appellants also argue that the district court was bound to abstain under the doctrine of *Younger v. Harris*, 401 U.S. 37, 91 S.Ct. 746, 27 L.Ed.2d 669 (1971) (*Younger*), because state court proceedings were pending when the temporary restraining order was granted in district court. We disagree.

 Under the *Younger* doctrine a federal court should not enjoin pending state

---

**7.** National formally requested the Director, pursuant to § 382.070(3) of the Insurance Act, for an exemption from the Act's pre-offer hearing and approval procedures. National proposed making no changes in Personal's management without the Director's approval, offered to refrain from any extraordinary transactions that might affect Personal without the Director's approval, proposed placing Personal's stock into a blind voting trust with trustees appointed who were acceptable to the Division of Insurance, and offered to go through the approval procedures of Chapter 382 with respect to the indirect acquisition of Personal and to divest itself of Personal stock if the Director did not grant approval. The Director rejected all these alternatives. Brief of National City Lines at 6.

In addition, the state court's order required National to comply with the Insurance Act as written before it could engage in its tender offer or proxy solicitation. *Personal Life Insurance Co. v. National City Lines*, No. CV181–734CC (Mo.Cir.Ct. Sept. 28, 1981), slip op. at 6; *Personal Life Ins. Co. v. National City Lines*, No. CV181–890CC (Mo.Cir.Ct. Nov. 16, 1981), slip op. at 2.

These facts compel the conclusion that there was no unsettled issue of state law concerning the applicability of the challenged provisions to National. Moreover, the facts distinguish this case from *Sun Life Group, Inc. v. Standard Life Ins.*, No. IP80–245C (S.D.Ind. Mar. 12, 1980), in which the Indiana Insurance Commissioner construed the Indiana Insurance Act consistently with the Williams Act prior to Sun Life Group, Inc.'s tender offer.

proceedings or state proceedings commenced after the filing of the federal action but prior to "proceedings of substance on the merits" in the federal suit. *Hicks v. Miranda*, 422 U.S. 332, 95 S.Ct. 2281, 45 L.Ed.2d 223 (1975). However, in order for *Younger* to apply, plaintiffs must be given the opportunity to present their federal claims in state court. *Juidice v. Vail*, 430 U.S. 327, 97 S.Ct. 1211, 51 L.Ed.2d 376 (1977). In the present case the state court expressly abstained from considering National's constitutional issues, deciding that those issues should be decided by the federal court. *Personal Life Insurance Co. v. National City Lines*, No. CV181–734CC (Mo. Cir.Ct. Sept. 28, 1981), slip op. at 5, and No. CV181–890CC (Mo.Cir.Ct. Nov. 16, 1981), slip op. at 2. Therefore, National had no opportunity in the state court proceedings to raise its constitutional challenges and, under such circumstances, abstention is inappropriate. *See Gibson v. Berryhill*, 411 U.S. 564, 93 S.Ct. 1689, 36 L.Ed.2d 488 (1973).

### C. *Anti-Injunction Act*

Finally, appellants argue that the relief sought by National is barred by the Anti-Injunction Act, 28 U.S.C. § 2283. The Act provides:

> A court of the United States may not grant an injunction to stay proceedings in a state court except as expressly authorized by Act of Congress, or where necessary in aid of its jurisdiction, or to protect or effectuate its judgments.

■ We disagree. The Anti-Injunction Act is inapplicable when a federal court has first obtained jurisdiction of a matter in controversy by the institution of suit. Not-withstanding the confines of the Anti-Injunction Act, the federal court may in these circumstances restrain subsequently filed state court proceedings involving the same subject matter.[8] The prohibition of the Act is only against interference in a "pending" state proceeding. *Dombrowski v. Pfister*, 380 U.S. 479, 484 n.2, 85 S.Ct. 1116, 1119 n.2, 14 L.Ed.2d 22 (1965); *Barancik v. Investors Funding Corp.*, 489 F.2d 933, 936 and n.8 (7th Cir. 1973); *see also* J. Moore, 1A *Moore's Federal Practice*, ¶ 0.208c at 2353 (1982).

■ For reasons set forth by then Circuit Judge, now Justice Stevens, the question whether state actions are "pending" is appropriately answered by reference to the date on which injunctive relief is *sought* in federal court, not the date on which injunctive relief is *granted*. *Barancik v. Investors Funding Corp.*, 489 F.2d at 936–37 (parties seeking to litigate an issue in state court may not obtain the benefit of the Anti-Injunction Act by commencing state proceedings while a motion to enjoin such action is pending in the federal court; if the Act were applied in these circumstances, the would-be state court litigant would have an absolute right to defeat a well-founded motion by taking the very act the federal court was being urged to enjoin); *cf. Roth v. Bank of the Commonwealth*, 583 F.2d 527 (6th Cir. 1978), *cert. denied*, 442 U.S. 925, 99 S.Ct. 2852, 61 L.Ed.2d 292 (1979).

■ Here, the determinative date is September 8, 1981, the date on which National petitioned for injunctive relief in federal court. On this date, there were no pending state proceedings, since Personal instituted its state court action against National's tender offer on September 11, 1981.[9]

---

8. The federal court should not, of course, ignore the principles of equity, comity and federalism which might preclude an injunction against state proceedings. *Mitchum v. Foster*, 407 U.S. 225, at 243, 92 S.Ct. 2151, at 2162, 32 L.Ed.2d 705; *Barancik v. Investors Funding Corp.*, 489 F.2d 933, 938 (7th Cir. 1973).

9. The focus of the parties' dispute later shifted to National's attempt to solicit proxies for a proxy fight. Personal returned to state court and in a separate suit, filed October 30, 1981, sought an injunction to prohibit the solicitation of proxies pending compliance with the Missouri Insurance Act. Three days later, on November 2, 1981, National amended its complaint in federal district court and obtained a preliminary injunction enjoining enforcement of the Missouri Insurance Act against National's proxy solicitation. One could argue from these facts that the new state court suit was "pending" at the time of the district court's injunctive order and that the Anti-Injunction Act prohibited this order.

We conclude, however, that as to all federal injunctive orders, the determinative date in de-

Therefore, the Anti-Injunction Act presented no bar to the district court's injunction against state proceedings.

## III. PREEMPTION OF TAKEOVER ACT

■ On appeal appellants argue that the Missouri Takeover Act is consistent with and therefore not preempted by the Williams Act because the purpose of both Acts is investor protection. They argue that the district court based its holding on the erroneous premise that the purpose of the Williams Act is to maintain a balance of neutrality between a tender offeror and the management of the target company. We disagree and hold that under the circumstances of this case the Williams Act preempts specific provisions of the Missouri Takeover Act because (1) the precommencement filing and hearing requirements have resulted in unacceptable delay in contravention of the Williams Act, and (2) specific substantive provisions of the Williams Act and SEC regulations are incompatible with the substantive provisions governing the same rights in the Missouri Act.

During the pendency of the present appeal the Supreme Court affirmed *MITE Corp. v. Dixon*, 633 F.2d 486 (7th Cir. 1980), *aff'd sub nom. Edgar v. MITE Corp.*, —— U.S. ——, 102 S.Ct. 2629, 73 L.Ed.2d 269 (1982), in which the Seventh Circuit held that the Illinois Business Takeover Act, Ill.Rev.Stat. ch. 121½, § 137.51 *et seq.* (Supp.1980), was unconstitutional under the Supremacy and Commerce Clauses of the federal Constitution. Our examination reveals that there are no significant distinctions between the Illinois and Missouri Takeover Acts; therefore, the issues raised under the Commerce Clause are controlled by the majority decision in *Edgar v. MITE Corp.* The issues we reach under the Supremacy Clause were only reached by a plurality in *Edgar v. MITE Corp.*

### A. The Legal Criteria

Article VI of the United States Constitution provides:

> This Constitution and the laws of the United States which shall be made in pursuance thereof ... shall be the supreme law of the land ..., anything in the Constitution or law of any state to the contrary notwithstanding.

The determination of whether a challenged state statute is "contrary" to the Constitution or a federal law and thus preempted is an inexact task. The tests to be applied in adjudicating questions of preemption have been summarized by the Supreme Court in *Jones v. Rath Packing Co.*, 430 U.S. 519, 525–26, 97 S.Ct. 1305, 1309–10, 51 L.Ed.2d 604 (1977) (citations omitted).

> The first inquiry is whether Congress, pursuant to its power to regulate commerce, U.S.Const., Art. 1, § 8, has prohibited state regulation of the particular aspects of commerce involved in this case.... [W]hen Congress has "unmistakably ... ordained," *Florida Lime & Avocado Growers, Inc. v. Paul*, 373 U.S. 132, 142 [83 S.Ct. 1210, 1217, 10 L.Ed.2d 248] (1963), that its enactments alone are to regulate a part of commerce, state laws regulating that aspect of commerce must fall. This result is compelled whether Congress' command is explicitly stated in the statute's language or implicitly contained in its structure and purpose.

■ Congressional enactments which do not expressly exclude state legislation in the field nevertheless override state laws with which they conflict. U.S.Const., Art. 1, § 8. In deciding whether state and federal laws are so inconsistent that state law must give way, we must "determine whether, under the circumstances of this particular case [the state's] law stands as an obstacle to the accomplishment and execution of the full purposes and objectives of Con-

termining whether state actions were pending is September 8, 1981. This is the date on which the controversy between the parties was effectively joined in federal court. The later injunctive order in federal court merely in-

volved an amendment of the original complaint. For purposes of invoking the Anti-Injunction Act, we construe the date of the amendment to relate back to the date on which injunctive relief was first sought.

gress." *Hines v. Davidowitz*, 312 U.S. 52, 67, 61 S.Ct. 399, 404, 85 L.Ed. 581 (1941). *Accord, De Canas v. Bica*, 424 U.S. 351, 363, 96 S.Ct. 933, 940, 47 L.Ed.2d 43 (1976); *Perez v. Campbell*, 402 U.S. 637, 649, 91 S.Ct. 1704, 1711, 29 L.Ed.2d 233 (1971); *Florida Lime & Avocado Growers, Inc. v. Paul*, 373 U.S. at 141, 83 S.Ct. at 1216.

Congress has not chosen to expressly or impliedly bar states from regulating tender offers. As noted by the Supreme Court in *Leroy v. Great Western United Corp.*, 443 U.S. 173, 182, 99 S.Ct. 2710, 2715, 61 L.Ed.2d 464 (1979), § 28(a) of the Securities Exchange Act of 1934 "was plainly intended to protect, rather than to limit, state authority." In the absence of explicit or implicit preemption, the issue is whether under the circumstances of this particular case the Missouri Act stands as an obstacle to the accomplishment and execution of the full purposes and objectives of Congress in passing the Williams Act. A careful comparison of the two Acts is necessary.

### B. *Conflict Between the Missouri Takeover Act and the Williams Act*

The Fifth Circuit succinctly described the purpose of the Williams Act as follows:

> The underlying purpose of the Williams Act is to protect investors.... Congress chose this goal in the Williams Act and adopted a distinct means of achieving it. Essentially, Congress relied upon a "market approach" to investor protection. *The function of federal regulation is to get information to the investor by allowing both the offeror and the incumbent managers of a target company to present fully their arguments and then to let the investor decide for himself.*

*Great Western United Corp. v. Kidwell*, 577 F.2d 1256, 1276 (1978) (emphasis added) (citations and footnotes omitted), *rev'd on venue grounds sub nom. Leroy v. Great Western United Corp.*, 443 U.S. 173, 99 S.Ct. 2710, 61 L.Ed.2d 464 (1979). *See also Piper v. Chris-Craft Industries, Inc.*, 430

U.S. 1, 22–24, 97 S.Ct. 926, 939–40, 51 L.Ed.2d 124 (1977); *Rondeau v. Mosinee Paper Corp.*, 422 U.S. 49, 58, 95 S.Ct. 2069, 2075, 45 L.Ed.2d 12 (1975); *Kennecott Corp. v. Smith*, 637 F.2d 181; *MITE Corp. v. Dixon*, 633 F.2d at 492.[10]

The legislative history further demonstrates that in enacting the Williams Act, "Congress was ... committed to a policy of neutrality in contests for control." *Piper v. Chris-Craft Industries, Inc.*, 430 U.S. at 29, 97 S.Ct. at 943. This is reflected in the House Report:

> It was urged during the hearings that takeover bids should not be discouraged because they serve a useful purpose in providing a check on entrenched but inefficient management. It was also recognized that these bids are made for many other reasons, and do not always reflect a desire to improve the management of the company. *The bill avoids tipping the balance of regulation either in favor of management or in favor of the person making the takeover bid.* It is designed to require full and fair disclosure for the benefit of investors while at the same time providing the offeror and management equal opportunity to fairly present their case.

H.R.Rep.No.1711, 90th Cong., 2d Sess., *reprinted in* [1968] U.S.Code Cong. & Ad. News at 2813 (emphasis added).

Congress' choice of a market approach to investor protection in the tender offer area, as well as the importance of neutrality between offerors and incumbent management to that protection, is reaffirmed in the new SEC tender offer regulations effective January 1980. The SEC stated that the new regulations were "necessary and appropriate in the public interest and for the protection of investors" to "ensure a balance between the interests of the person making a tender offer and the management of the company whose securities are sought." Securities Exchange Act Release No. 34–

---

**10.** Passage of the Williams Act was designed to close the gap in the disclosure requirements of the federal securities laws by bringing cash tender offers, which therefore stood virtually unregulated, within the ambit of federal securities regulation. *See generally* S.Rep.No.550, 90th Cong., 1st Sess. 2–4 (1967); H.R.Rep.No. 1711, 90th Cong., 2d Sess. 2–4 (1968), *reprinted in* [1968] U.S.Code Cong. & Ad.News 2811.

16384, [1979–80] Fed.Sec.L.Rep. (CCH) ¶ 82,373 at 82,577 (Nov. 29, 1979). The SEC observed that state legislation, specifically legislation extending the length of tender offers, may have "tipped the carefully constructed balance between the bidder and subject company envisioned by the Williams Act in favor of [the] subject company." *Id.* at ¶ 82,596.

### 1. Timetables

The Williams Act requires the disclosure of certain information, imposes substantive restrictions and includes a general anti-fraud provision. It also confers broad rule-making authority upon the SEC. In particular, SEC Rule 14d–2(b) requires an offeror to commence or withdraw the tender offer within five business days of the first public announcement of the tender offer. 17 C.F.R. § 240.14d–2(b). As the Third Circuit explained:

> The commencement of the offer is the time at which an offeror is required to disseminate to shareholders the material information regarding the offer that the federal securities laws require. An offeror must file a disclosure statement on schedule 14D–1 with the [SEC], and must take certain additional steps to effect actual receipt by the shareholders of material information relating to the offer, the companies involved in the offer, and the terms of the offer. The federal policy underlying these requirements is to insure the prompt dissemination of all material information after the first public announcement. The information is necessary because the announcement of the offer itself will precipitate significant market activity in the securities of the target company, thus confronting public investors with an immediate need to make investment decisions. See SEC Release No. 34–16384, 44 Fed.Reg. 70326, 70329 n.15 (1979).

*Kennecott Corp. v. Smith*, 637 F.2d at 182–83.

In contrast, the statutory scheme embodied in the state Act envisions a minimum twenty-day waiting period after the offeror has filed detailed disclosure statements with both the Missouri Commissioner and the offeree company before a tender offer becomes effective. Mo.Rev.Stat. § 409.-515.1. In addition, the pre-effective waiting period can be extended if the Commissioner schedules a hearing on the adequacy of the disclosures in the registration statement, as he may do at his own discretion, Mo.Rev.Stat. § 409.515.1(2), and must do at the request of any person aggrieved by the Commissioner's failure to hold a hearing. Mo.Rev.Stat. § 409.555.[11] If such a hearing is ordered by the Commissioner it must be held within forty days of the filing of the registration statement, Mo.Rev.Stat. § 409.-530.2.[12] During such period the offeror cannot proceed with its takeover bid until the Commissioner determines that "the offeror proposes to make full, fair and effective disclosure to offerees of all information material to a decision to accept or reject the offer." Mo.Rev.Stat. § 409.515.1(2).

In effect the Missouri Act upsets the congressionally designed balance by creating delay in the commencement and consummation of the tender offer. While the hearings authorized by the Missouri Act are underway and the tender offer is suspended, the management of the target company can take a number of steps, fully described in other cases, to defeat the offer. *See Kennecott Corp. v. Smith*, 637 F.2d 181; *MITE Corp. v. Dixon*, 633 F.2d 486; *Great Western United Corp. v. Kidwell*, 577 F.2d 1256. Such a delay and advantage to the target company are inconsistent with the scheme of the Williams Act.

11. The Act does not make clear whether an offeree company is an "aggrieved person" with standing to protest the commissioner's action in refusing to order a hearing on a takeover bid. The state appellants state that an offeree company is not an aggrieved party, State Appellants' Brief at 23; *but see* Jefferies, *Tender Offers and the New Missouri Takeover Bid Disclosure Act*, 35 J.Mo. Bar 123, 127 (March 1979), stating that presumably the offeree company is an "aggrieved person" within the meaning of the statute.

12. The Act does not fix any time within which the hearing must be completed. Presumably it could be extended indefinitely.

Appellants concede that the prefiling requirements of the Missouri Act, Mo.Rev. Stat. § 409.515.1, are in conflict with and preempted by SEC Rule 14d–2(b). Brief for Appellant LLC Corp. at 41–42. However, they argue that the hearing requirements are consistent with the Williams Act's goal of investor protection. They argue that the hearing ensures complete disclosure and provides shareholders more time to consider whether to tender their shares. *See* Note, *Securities Law and the Constitution: State Tender Offer Statutes Reconsidered*, 88 Yale L.J. 510, 521–25 (1979).

However, the legislative history of the Williams Act demonstrates that Congress considered whether such delay confers necessary protection or imposes unwarranted obstacles and decided tender offers "were not to be hindered (by delay under state law) to the detriment of investors." *MITE Corp. v. Dixon*, 633 F.2d at 498 (citations omitted). *See also Great Western United Corp. v. Kidwell*, 577 F.2d at 1279.[13]

Appellants argue, however, that *MITE Corp. v. Dixon* is distinguishable on the basis that it involved a state statute which authorized the state securities commission to conduct hearings on whether the takeover offer was inequitable. Appellants argue that the Missouri statute, which does not contain such a provision, does not pose the same risk of "benevolent bureaucracy." However, this qualitative difference is insufficient to cause this court to reach a different result. State statutes which can

be used to unduly delay tender offers are preempted by the Williams Act. The extended delay threatens the viability of tender offers by discouraging the tender offeror from completing the offer once made.

2. Disclosure Requirements

Next, the Missouri Act requires substantially more disclosure than the Williams Act, including "such additional information as the commissioner may require as necessary in the public interest or for the protection of investors." *Compare* Mo.Rev.Stat. § 409.515 with 15 U.S.C. § 78n(d)(1), 17 C.F.R. § 240.24d–3 (1981),[14] and 15 U.S.C. § 78m(d)(1), 17 C.F.R. § 240.13d–1 (1981).[15] On appeal appellants argue that Missouri's more extensive disclosures are consistent with the Williams Act's goal of investor protection.

However, "[d]isclosure of a mass of irrelevant data can confuse the investor and obscure relevant disclosures." *Great Western United Corp. v. Kidwell*, 577 F.2d at 1280 (citations omitted). *Accord, Dart Industries, Inc. v. Conrad*, 462 F.Supp. 1, 13 (S.D.Ind.1978). Similarly, the Supreme Court warned in *TSC Industries, Inc. v. Northway, Inc.*, 426 U.S. 438, 448, 96 S.Ct. 2126, 2131, 48 L.Ed.2d 757 (1976), that excessive disclosure requirements "may accomplish more harm than good" by confusing shareholders. Such a result conflicts with the Williams Act's goal of unfettered choice by well-informed investors. As not-

---

13. In 1965, Congress rejected a proposed twenty-day prenotification requirement. *See* 111 Cong.Rec. 28257–28259 (1965). In 1967, Congress rejected a five-day prenotification requirement S.Rep.No.550, 90th Cong., 1st Sess. 4 (1967) U.S.Code Cong. & Admin.News 1968, p. 2811; Hearings on S. 510 Before the Subcomm. on Securities of the Senate Comm. on Banking and Currency, 90th Cong., 1st Sess. 72 75, 87- 89, 98, 105, 139–40, 151, 163, 245 (1967); Hearings on H.R. 14475 and S. 510 Before the Subcomm. on Commerce and Finance of the House Comm. on Interstate and Foreign Commerce, 90th Cong., 2d Sess. 44–46, 50 54 (1968). In 1970, Congress rejected yet another prenotification proposal. *See* Hearings on H.R. 4285, S. 3431 and S. 336 Before the Subcomm. on Commerce and Finance of the

House Comm. on Interstate and Foreign Commerce, 91st Cong., 2d Sess. 6–7 (1970).

14. 15 U.S.C. § 78n(d)(1), 17 C.F.R. § 240.24d–3 (1981), provides that upon commencement of the tender offer the offeror must file with the SEC, publish or send to the shareholders of the target company, and furnish to the target company, detailed information about the offer.

15. 15 U.S.C. § 78m(d)(1), 17 C.F.R. § 240.-13d–1 (1981), provides that the offeror must disclose information about its background and identity, the source of the funds to be used in making the purchase, the purpose of the purchase, including any plans to liquidate the company or make major changes in its corporate structure, and the extent of the offeror's holdings in the target company.

ed by the House and Senate Reports on the Williams Act, "[t]he bill is designed to make the *relevant facts* known so that shareholders have a fair opportunity to make their decision." H.R.Rep.No.1711, 90th Cong., 2d Sess. 3 (1968); S.Rep.No.550, 90th Cong., 1st Sess. 3 (1967) (emphasis added), *reprinted in* [1968] U.S.Code Cong. & Ad.News.

In § 13(d) of the Williams Act, Congress delegated to the SEC the task of specifying what data is material to aid an investor considering a tender offer. "The SEC has attempted to write disclosure requirements that provide enough material information without producing reports so detailed and complicated that few shareholders would want to read them . . . . That judgment is a legislative one." *Great Western United Corp. v. Kidwell*, 577 F.2d at 1280–81 (citations omitted). Missouri's attempt to second-guess that judgment cannot stand. *See Florida Lime & Avocado Growers, Inc. v. Paul*, 373 U.S. at 171, 83 S.Ct. at 1232.

### 3. Substantive Requirements

Both the Missouri and Williams Acts establish minimum substantive requirements for all takeover bids. Among the substantive rights granted by both acts are withdrawal rights and pro rata rights. The time periods for withdrawal and pro rata rights under the state act are different from the time periods for these rights under federal law.[16]

Under the Williams Act, shareholders who tender their shares may withdraw them during the first seven days of a tender offer and, if the offeror has not yet purchased their shares, at any time after sixty days from the commencement of the offer. 15 U.S.C. § 78n(d)(5).[17] The Missouri Act grants withdrawal rights at any time within twenty-one days from the date of the original offer and each amended offer. Mo.Rev.Stat. § 409.510(3).

Under the Williams Act, if within ten days of the commencement of the tender offer more shares are deposited by tendering shareholders than the tender offer seeks, the offeror must take these shares on a pro rata basis. 15 U.S.C. § 78n(d)(6). The Missouri Act, however, does not impose a time limit and requires pro rata acceptance of all shares that have been deposited throughout the period of the offer. Mo. Rev.Stat. § 409.510(4).

The SEC rules provide that an offer need remain open beyond the stated termination date only when it is amended to increase the consideration, and in these circumstances, only for an additional ten business days. 17 C.F.R. § 240.14e–1(b). In contrast, the Missouri Act provides that if a tender offer is amended for any reason, the deposit period for shares must extend for at least twenty-one days from the date of the amendment. Mo.Rev.Stat. § 409.510(2).

Thus, these substantive Missouri provisions directly conflict with the applicable federal statutes and regulations. Requiring National to comply with both Acts' requirements is impossible and frustrates the operation and purposes of the Williams Act. Therefore, application of these provisions of the Missouri Act to National's offer is unconstitutional. *See Dart Industries, Inc. v. Conrad*, 462 F.Supp. at 12–13.

The Missouri Act also discriminates between tender offerors and target management. Mo.Rev.Stat. § 409.505(3)(d) exempts from regulation those offers approved by the target company's board of directors. Similarly, all written solicitation materials of an offeror are subject to a ten-day advance filing requirement with the Commissioner and the target company, Mo.Rev.Stat. § 409.515.3, while communications by the offeree company or any other person may be sent immediately upon a

---

**16.** At trial National also challenged Mo.Rev. Stat. § 409.510(5) governing an offeror's obligation to pay amended increased compensation to offerees whose securities were taken up before the amendment. The district court found this section to be unconstitutional. However, our examination reveals that the provision appears to be consistent with 15 U.S.C.

§ 78n(d)(6). National has not renewed its argument on appeal and therefore we do not reach it.

**17.** The seven-day withdrawal period contained in the Williams Act has been extended to fifteen business days by the Commission. 17 C.F.R. § 240.14d–7(a)(1) (1981).

filing with the Commissioner, Mo.Rev.Stat. § 409.520.

The district court found these provisions unconstitutional because they shifted the advantage in a takeover situation to management and also delayed prompt disclosure of crucial information to shareholders. We agree and hold that these discriminatory provisions disrupt the neutrality essential to the proper operation of the market approach of protecting investors utilized by the Williams Act. For these reasons federal courts have invalidated similar discriminating provisions in state takeover acts. *See Great Western United Corp. v. Kidwell,* 577 F.2d at 1279–80; *MITE Corp. v. Dixon,* 633 F.2d at 497–98; *Dart Industries, Inc. v. Conrad,* 462 F.Supp. at 13.

 In addition, as previously noted, the Missouri Takeover Act is also invalid under the Commerce Act under the Supreme Court's ruling in *Edgar v. MITE Corp.*

## IV. APPLICABILITY OF THE INSURANCE ACT

The Missouri Insurance Holding Companies Act (Insurance Act), Mo.Rev.Stat. § 382.010 *et seq.,* is patterned on a model act drafted by the National Association of Insurance Commissioners. The model act, entitled the Insurance Holding Companies Act, was drafted in 1969 and has presently been adopted, in various versions, by a majority of the states.[18]

The challenged provisions provide, in effect, that before any person can acquire control of a domestic insurer it must file with the director and send to the insurer a detailed disclosure statement and also have its offer approved by the director after a public hearing. Section 382.040, which defines the applicability of the acquisition provisions, defines "domestic insurer" as "[f]or purposes of this section, a domestic insurer shall include any other person controlling a domestic insurer *if such other person is either directly or through its affiliates primarily engaged in the business of insurance*" (emphasis added).

 On September 10, 1981, National was advised by letter that it was the opinion of the Director that the acquisition provisions applied to National's tender offer because LLC controlled a domestic insurer.[19] National Exhibit No. 6. National challenged the applicability of § 382.040 on the basis that LLC was not a domestic insurer because it was not engaged "primarily in the business of insurance." The district court did not address the issue and the state court simply deferred to the Director's opinion. *Personal Life Insurance Co. v. National City Lines, supra,* No. CV181–734CC, slip op. at 3. We disagree with the Director's interpretation and hold that § 382.040 is inapplicable on its face to National because it was not attempting to acquire control of a "domestic insurer."[20]

The term "domestic insurer" as defined in § 382.040 includes both domestic insurers and companies which control domestic insurers *if* those companies are directly or through their affiliates "primarily engaged in the business of insurance." The syntax clearly implies that there are two distinct threshold requirements for applicability to non-domestic insurers: (1) they must "control" a domestic insurer; and (2) they must, considering the aggregate of business activity, be primarily engaged in the business of insurance. As a rule, a definition which declares what a term "means" is binding upon the court. *See Colautti v. Franklin,*

18. As of 1973 similar versions of the Act had been enacted in thirty-seven states. *See American General Insurance Co. v. FTC,* 1973 Trade Cases ¶ 74,570 at 94, 497 n.5.

19. The Director did not express an opinion as to whether the Act was applicable to National's proxy solicitation. However, LLC vigorously asserted that it applied to all methods of acquiring control of a domestic insurer. In view of our holding we need not determine this issue.

20. The major issue on appeal concerning the Insurance Act was whether the challenged provisions were preempted by the Supremacy, Commerce and Full Faith and Credit Clauses of the federal constitution. In view of our holding we need not reach the constitutional issues and venture no opinion as to the constitutionality of the Act.

439 U.S. 379, 392–93 n.10, 99 S.Ct. 675, 684, 58 L.Ed.2d 596 *citing* 2A C. Sands, Statutes and Statutory Construction § 47.07 (4th ed. Supp. 1978); *Conoco, Inc. v. Federal Energy Regulatory Comm'n*, 622 F.2d 796, 798 (5th Cir. 1980).

In the present case LLC does not satisfy the second threshold requirement. The entire LLC corporate group derives approximately ten percent of its operating revenues and nine percent of its assets from the insurance subsidiary.[21] Therefore, even though it does control a domestic insurer, LLC itself does not fall within the statutory definition because it is not primarily engaged in the business of insurance. The Director's determination that LLC is a domestic insurer ignores the second requirement in violation of the canon of construction that a statute should be interpreted so as not to render one part inoperative. *See United States v. Menosche*, 348 U.S. 528, 538–39, 75 S.Ct. 513, 519–20, 99 L.Ed. 615 (1955).

The only support for the Director's position was his statement that "domestic insurer" included "anybody that would have any interest in how insurance companies operate." Deposition of Donald Ainsworth at 12.[22] However, that construction is at odds with the plain meaning of § 382.040. The plain meaning of a statute should be rejected only if there is substantial unambiguous evidence supporting a contrary interpretation. *See Consumer Product Safety Commission v. GTE Sylvania, Inc.*, 447 U.S. 102, 108, 100 S.Ct. 2051, 2056, 64 L.Ed.2d 766 (1979); *Matala v. Consolidation Coal Co.*, 647 F.2d 427, 429 (4th Cir. 1981); *Blue Cross Association v. Harris*, 622 F.2d 972, 977 (8th Cir. 1980).

In the present case appellants have not directed us to any legislative history or cases supporting their interpretation. Our research indicates that no court has decided the precise issue before us. However, the cases we have found discussing the application of the acquisition provisions of the Insurance Holding Companies Act only involved the acquisition of control of domestic insurers, *see, e.g., Roussel v. Boren*, —— F.Supp. ——, No. 78–2345 (E.D.La. Nov. 6, 1978); *Berger v. General United Group*, 268 N.W.2d 630 (Iowa 1978), or the acquisition of control of parent companies primarily engaged in the business of insurance, *see, e.g., In re Application of Midwestern Fidelity*, 26 Pa.Cmwlth. 211, 363 A.2d 892 (1976).

In addition, our examination of other states' Insurance Holding Acts indicates that they also impose a dual threshold requirement of applicability to persons acquiring non-domestic insurers. The Minnesota Act defines domestic insurer as "a domestic insurer or ... a person which (1) is in control of a domestic insurer, *and* (2) is engaged primarily either directly or indirectly through its subsidiaries in the business of insurance ...." Minn.Stat.Ann. § 600.02 (emphasis added). Iowa's act also clearly establishes the dual requirements. It defines domestic insurer as "[f]or purposes of this section a domestic insurer shall include any other person controlling a domestic insurer *unless* such other person is either directly or through its affiliates primarily engaged in business *other* than the business of insurance." Iowa Code Ann. § 521A.3 (West) (emphasis added).

Having found no clear indication of legislative intent to the contrary, we hold that the definition of domestic insurer found in § 382.040 is binding upon us. We further hold that under the statutory definition LLC is not a domestic insurer and therefore the provisions of the Insurance Act governing acquisition of control of a domestic insurer are inapplicable to National.

In summary, we conclude that the Missouri Takeover Act is invalid under the Supremacy and Commerce Clauses of the

---

**21.** These figures were derived from LLC's 1980 Annual Report and Form 10–K for the fiscal year ended June 30, 1980. National's Exhibits Nos. 48, 49.

**22.** At the time of this action Donald Ainsworth had only been the Director for eight months.

In his deposition he conceded that he had had no prior experience with the Division of Insurance of regulatory matters. He also stated that this was his first experience with a contested takeover attempt. Deposition of Donald Ainsworth at 15–24.

federal Constitution. We further conclude that the Missouri Insurance Act does not apply to National's efforts to acquire control of LLC because LLC is not directly or through its affiliates primarily engaged in the business of insurance.

ARNOLD, Circuit Judge, concurring in part and dissenting in part.

I concur in the Court's opinion except for Part II C, holding that 28 U.S.C. § 2283 is not a bar to an injunction against proceedings in the courts of Missouri. As to that point, I dissent.

I cannot accept the theory that the state-court actions were not "pending" for purposes of the Anti-Injunction Act. As the Court notes, *Barancik v. Investors Funding Corp.*, 489 F.2d 933, 936–37 (7th Cir. 1973), supports this view. I disagree for the reasons stated in *Roth v. Bank of the Commonwealth*, 583 F.2d 527 (6th Cir. 1978), *cert. denied*, 442 U.S. 925, 99 S.Ct. 2852, 61 L.Ed.2d 292 (1979). I do not believe that the mere filing of a motion in a federal court seeking to enjoin state-court proceedings should in and of itself deprive later-filed state-court actions of the protection of § 2283. The relevant time for the application of the Anti-Injunction Act, in my opinion, is the date on which federal relief is granted, not the date on which it is sought.

We should be slow to take any steps that erode the independence and autonomy of the state courts. Those courts are just as bound as we are to respect the Constitution and laws of the United States. They are courts of general jurisdiction, unlike us, and they are not mere creatures of Congress, as are the inferior federal courts, including us. Ever since 1793 the Anti-Injunction Act has stood as a limitation on our power (not merely on our discretion) of prime importance to federalism. I conclude with the words of Mr. Justice Black in *Atlantic Coast Line R.R. v. Locomotive Engineers*, 398 U.S. 281, 296–97, 90 S.Ct. 1739, 1747–48, 26 L.Ed.2d 234 (1970), recently applied by this Court in *In re Federal Skywalk Cases*, 680 F.2d 1175 (8th Cir. 1982):

This case is by no means an easy one. The arguments in support of the union's contentions are not insubstantial. But

whatever doubts we may have are strongly affected by the general prohibition of § 2283. Any doubts as to the propriety of a federal injunction against state court proceedings should be resolved in favor of permitting the state courts to proceed in an orderly fashion to finally determine the controversy. The explicit wording of § 2283 itself implies as much, and the fundamental principle of a dual system of courts leads inevitably to that conclusion.

I therefore respectfully dissent in part.