**HAYFIELD NORTHERN RAILROAD COMPANY, INC., Plaintiff/Appellant,**

v.

**CHICAGO AND NORTH WESTERN TRANSPORTATION COMPANY, Defendant/Appellee,**

**State of Minnesota, Intervenor/Appellant.**

**No. 82-1880.**

United States Court of Appeals, Eighth Circuit.

Submitted Sept. 16, 1982.

Decided Dec. 3, 1982.

Rehearing and Rehearing En Banc Denied Jan. 18, 1983.

Robert S. Abdalian, Ward, Gray & Oehler, Ltd., Rochester, Minn., for plaintiff/appellant.

Warren R. Spannaus, Atty. Gen., State of Minn., Gilbert S. Buffington, Sp. Asst. Atty. Gen., St. Paul, Minn., for State of Minnesota.

Thomas E. Glennon, Lindquist & Vennum, Minneapolis, Minn., James P. Daley, Stuart F. Gassner, Anne E. Keating, Chicago, Ill., for defendant/appellee Chicago and North Western Transp. Co.

Before HEANEY, BRIGHT and ARNOLD, Circuit Judges.

ARNOLD, Circuit Judge.

In this case we must decide whether 49 U.S.C. § 10905 (Supp. IV 1980) preempts Minnesota condemnation law when a Minnesota railroad company attempts to condemn the track and right of way of a properly abandoned rail line in order to continue rail service on that line. We conclude that it does.

I.

On January 30, 1981, Chicago and North Western Transportation Company (CNW) filed an application for a certificate of abandonment for its railroad line between Oelwein, Iowa, and Randolph, Minnesota. Several shippers from southern Minnesota (Shippers Group) opposed the abandonment of a 19.2-mile segment of the line between Dodge Center and Sargeant, Minnesota, and between Hayfield and Waltham, Minnesota. After an Administrative Law Judge (ALJ) found that the public convenience and necessity permitted abandonment of the entire line, the Shippers Group, pursuant to 49 U.S.C. § 10905, made an offer to subsidize operation of the 19.2-mile segment. When the parties could not agree on terms, the Interstate Commerce Commission found that the net liquidation value of the segment was $1,791,354.[1] Shortly thereafter, the Shippers Group withdrew their offer, and, on November 17, 1981, the certificate of abandonment issued.

Soon after making the subsidy offer, the Shippers Group filed an administrative appeal of the ALJ's decision authorizing abandonment. The Commission denied the appeal, and the Shippers Group filed a petition for review in this Court. In early January 1982, after unsuccessfully seeking a stay of the order permitting abandonment, the Shippers Group withdrew their appeal of the substantive decision.

Meanwhile, CNW made contracts with the State of Iowa and some Iowa shippers which involved improving certain trackage in Iowa. CNW planned to salvage and use the rail from the 19.2-mile segment for this purpose.

On March 31, 1982, members of the Shippers Group formed the Hayfield Northern Railroad Company, Incorporated, which, un-

---

1. It was necessary to determine net liquidation value before the amount of the subsidy could be calculated. The subsidy should equal "the difference between the revenues attributable to that part of the railroad line and the avoidable cost of providing rail freight transportation on the line, plus a reasonable return on the value of the line ...." 49 U.S.C. § 10905(d)(2)(A). One element of the "value of the line" is the net

der Minnesota law,[2] had the power to condemn abandoned rail lines. On the same day, Hayfield Northern filed suit in the Dodge County, Minnesota, District Court, alleging that it wanted to condemn the track, appurtenances, and right of way on the 19.2-mile segment and requesting a temporary restraining order to prevent CNW from removing the property. The state court granted the restraining order.

CNW then removed the suit to the United States District Court for the District of Minnesota,[3] and the State of Minnesota intervened to defend the constitutionality of its condemnation law as applied. The District Court[4] entered summary judgment in favor of CNW, dissolved the restraining order, and dismissed Hayfield Northern's complaint with prejudice, holding that, on the facts presented, 49 U.S.C. § 10905 preempts state condemnation procedures.

Hayfield Northern appealed and moved for a stay pending appeal and for an expedited appeal. After argument, this Court granted the motions upon the posting of a $100,000 bond. We now affirm.

## II.

■ Two recent Supreme Court cases, *Fidelity Federal Savings & Loan Association v. de la Cuesta,* —— U.S. ——, 102 S.Ct. 3014, 73 L.Ed.2d 664 (1982), and *Edgar v. MITE Corp.,* —— U.S. ——, 102 S.Ct. 2629, 73 L.Ed.2d 269 (1982), guide our inquiry into whether Minnesota condemnation law is superseded by § 10905. The preemption doctrine is derived from the Supremacy Clause, U.S. Const. art. VI, cl. 2, which reads:

This Constitution and the Laws of the United States which shall be made in Pursuance thereof ... shall be the supreme Law of the Land ..., any Thing in the Constitution or Laws of any State to the Contrary notwithstanding.

As we observed in *National City Lines, Inc. v. LLC Corp.,* 687 F.2d 1122, 1128 (8th Cir. 1982), the determination whether a state law is "contrary" to a federal statute, and thus preempted, is an inexact task; the answer depends on Congress's intent. Congress may have intended that its enactment foreclose all state legislation on the same subject, or it may have intended to leave the states free to enforce nonconflicting laws and regulations.

Congress's intent to foreclose all state law on the same subject, to "occupy the field," may be express, explicitly stated in the statute, or implied, implicitly contained in the statute's structure and purpose. *Fidelity Federal Savings & Loan Association, supra,* 102 S.Ct. at 3022.

Absent explicitly pre-emptive language, Congress' intent to supersede state law altogether may be inferred because "[t]he scheme of federal regulation may be so pervasive as to make reasonable the inference that Congress left no room for the States to supplement it," because "the Act of Congress may touch a field in which the federal interest is so dominant that the federal system will be assumed to preclude enforcement of state laws on the same subject," or because "the object sought to be obtained by federal law and the character of obligations imposed by it may reveal the same purpose."

*Ibid.* (quoting *Rice v. Santa Fe Elevator Corp.,* 331 U.S. 218, 230, 67 S.Ct. 1146, 1152, 91 L.Ed. 1447 (1947)).

■ Without regard to whether Congress intended to foreclose all state legislation on the same subject, "a state statute is void to the extent that it actually conflicts with a valid federal statute ...." *MITE Corp., supra,* 102 S.Ct. at 2635. An actual conflict may be found either

when "compliance with both federal and state regulations is a physical impossibili-

---

liquidation value of the rail properties on the line. 49 C.F.R. § 1121.44(c) (1981).

**2.** Minn.Stat.Ann. § 222.27 (West 1972); Minn. Stat.Ann. § 300.04 (West Supp.1982).

**3.** Jurisdiction was based on diversity of citizenship.

**4.** The Hon. Paul A. Magnuson, United States District Judge for the District of Minnesota.

ty," *Florida Lime & Avocado Growers, Inc. v. Paul,* 373 U.S. 132, 142–143, 83 S.Ct. 1210, 1217, 10 L.Ed.2d 248 (1963), or when state law "stands as an obstacle to the accomplishment and execution of the full purposes and objectives of Congress," *Hines v. Davidowitz,* 312 U.S. 52, 67, 61 S.Ct. 399, 404, 85 L.Ed. 581 (1941). *Fidelity Federal Savings & Loan Association, supra,* 102 S.Ct. at 3022.

■ Although "we start with the assumption that the historic police powers of the States were not to be superseded by the Federal Act unless that was the clear and manifest purpose of Congress," *Jones v. Rath Packing Co.,* 430 U.S. 519, 525, 97 S.Ct. 1305, 1309, 51 L.Ed.2d 604 (1977) (quoting *Rice v. Santa Fe Elevator Corp.,* 331 U.S. 218, 230, 67 S.Ct. 1146, 1152, 91 L.Ed. 1447 (1947)), we hold that the state law authorizing Hayfield Northern to condemn CNW's abandoned railroad line for continuing rail purposes "stands as an obstacle to the accomplishment and execution of the full purposes and objectives of Congress." Thus, the state law is preempted by § 10905.

### III.

By enacting § 10905, Congress intended to "assist shippers who are sincerely interested in improving rail service, while at the same time protecting carriers from protracted legal proceedings which are calculated merely to tediously extend the abandonment process." H.R.Conf.Rep. No. 1430, 96th Cong., 2d Sess. 125, *reprinted in* 1980 U.S.Code Cong. & Ad.News 3978, 4110, 4157. The statute is carefully tailored to accomplish that purpose, and it makes provision for continued rail service an integral part of the federal abandonment process.

Congress prescribed very precise time limits in § 10905. After the Commission decides to authorize abandonment, it must publish its findings in the *Federal Register.* Offers of financial assistance, either to subsidize or to purchase, must be made within ten days following publication. § 10905(c). If the Commission determines within fifteen days of publication that the offeror is financially responsible and that the amount of the offer is adequate, issuance of the certificate of abandonment is postponed pending negotiations between the parties. § 10905(d). If the parties fail to agree within thirty days after the offer is made, the certificate of abandonment is issued unless either party requests that the Commission establish the conditions and amount of compensation, § 10905(e), including the price and terms of any proposed sale, § 10905(f)(1)(C). If such a request is made, the Commission must comply within sixty days. § 10905(f)(1)(A). The Commission's decision about compensation is binding on both parties, except that the offeror may withdraw its offer within ten days of the decision. § 10905(f)(2). Thus, under § 10905, any arrangements for continued rail service will be complete within 110 days.

Congress was also concerned with the orderly operation of the line after its transfer. Although a subsidizer may discontinue the subsidy on sixty days' notice, a purchaser may not transfer or discontinue service on the line for two years after the sale and may not transfer the line to anyone other than the transferor carrier for five years after the sale. § 10905(f)(4), (5).

The elaborate procedural detail of this scheme indicates that not only has Congress granted the Commission exclusive and plenary authority to regulate abandonments, *Chicago & North Western Transportation Co. v. Kalo Brick & Tile Co.,* 450 U.S. 311, 320, 101 S.Ct. 1124, 1131, 67 L.Ed.2d 258 (1981), Congress has also granted the Commission exclusive and plenary authority to provide for continuation of rail service in connection with abandonments.

### IV.

To allow Hayfield Northern to use state condemnation proceedings to condemn CNW's right of way and track for purposes of continued rail service would frustrate the accomplishment of Congress's purpose in enacting § 10905. For example, the benefits of the 110 day time schedule would be lost, since the state proceedings, once com-

menced,[5] could take years. Moreover, at the end of the proceedings, Hayfield Northern would have the option to walk away and not pay the award.[6] Although CNW might recover costs and attorneys' fees under Minn.Stat.Ann. § 117.195 (West 1977), it could recover consequential damages, if at all, only by bringing a separate lawsuit. See *State v. Savage*, 255 N.W.2d 32 (Minn. 1977). Thus, to allow Hayfield Northern to bring a condemnation action would expose CNW to the "protracted legal proceedings" that the procedure set out in § 10905 was designed to avoid.

In addition, to allow Hayfield Northern to condemn the 19.2-mile segment would circumvent the Commission's determination of value. If the Shippers Group wanted to own the line, they could have offered to purchase it, and the Commission, if requested, could set the price and terms of sale. § 10905(e), (f)(1)(C). In fact, the Shippers Group chose to offer to subsidize, but even so, the Commission determined the net liquidation value of the line so that the amount of the subsidy could be calculated.[7] We see no reason to allow the Shippers Group, acting through Hayfield Northern, to force CNW to litigate the question of value in a state court when Congress has provided an expedited method by which sale price may be determined, especially when one determination of value has already been made.

## V.

Hayfield Northern and the State of Minnesota, the appellants, argue that the Commission has recognized that abandoned lines may be condemned under state authority, and that we should "give deference to the interpretation given a statute by the offi-

cers or agency charged with its administration." *South Eastern Human Development Corp. v. Schweiker*, 687 F.2d 1150, 1157 (8th Cir.1982). We do not believe, however, that the Commission has interpreted § 10905 in the manner in which the appellants contend.

In *Modern Handcraft, Inc.-Abandonment in Jackson County, Mo.*, 363 I.C.C. 969 (1981), a carrier which owned an eight-mile rail line in Kansas City, Missouri, ceased all rail operations on the line in 1968. In 1980 two noncarriers, an adjacent landowner and a mass transit organization, applied for a certificate of abandonment on the line. In ruling in favor of the noncarriers, the Commission said,

> We will not allow our jurisdiction to be used to shield a carrier from the legitimate processes of State law where there is no overriding Federal interest in interstate commerce. Where as here there have been no rail operations for over 12 years and no attempt to provide rail service, we can find no public benefit in preventing a State condemnation proceeding.

*Id.* at 972. The appellants' reliance on this language is misplaced, however. *Modern Handcraft* involved the possibility of state condemnation of an abandoned rail line for non-rail "public purposes," not for continued rail service. The acquisition of rail property for public purposes is governed by 49 U.S.C. § 10906 (Supp. IV 1980), and § 10906 does not apply to the acquisition of rail property in order to continue rail service. See *Chicago & North Western Transportation Co.-Abandonment-Between Clintonville & Eland, WI*, 363 I.C.C. 975, 976 (1981). It is unnecessary for us to decide in this case whether condemnation for non-rail public purposes would also be pre-empted by federal law.

---

5. Hayfield Northern has not yet filed its condemnation action, for reasons we do not understand.

6. Under Minnesota law, a condemnor may abandon the condemnation proceedings at any time before the parties' rights have "vested." See *County of Hennepin v. Mikulay*, 292 Minn. 200, 210–13, 194 N.W.2d 259, 265–67 (1972); *State v. Myhra G.M.C. Truck & Equipment Co.*,

254 Minn. 17, 18–19, 93 N.W.2d 204, 205 (1958).

7. See *supra* note 1. Under 49 C.F.R. § 1121.-44(c) (1981), net liquidation value is determined by calculating the market value of the property for *non-rail purposes* less costs of disposing of improvements necessary to make the remaining property available for its highest and best use.

The appellants also rely on the rulemaking proceedings in *Ex Parte No. 274 (Sub-No. 6), Abandonment of Railroad Lines and Discontinuance of Service (49 C.F.R. Part 1121),* 365 I.C.C. 249 (1981). In these proceedings the Commission noted the Association of American Railroads' "concern that prospective State purchasers with condemnation powers might, after obtaining a Commission determination of the value of a line, then seek a more favorable valuation in a condemnation action in a local court," *id.* at 260, but declined to adopt the Association's proposal that a forfeitable bond be required. This language, however, does not demonstrate that the Commission agreed with the Association's (and the appellants') interpretation of the statute. The appellants also point to the Commission's statement that

The Commission has been granted only limited jurisdiction to direct a sale; under 49 U.S.C. 10905 we can require a sale, which will *provide continued rail service.* In all other instances, the disposition of rail property after an effective certificate of abandonment has been exercised is a matter beyond the scope of the Commission's jurisdiction, and within a State's reserved jurisdiction. Questions of title to, and disposition of, the property are the matters subject to State law.

*Id.* at 261 (emphasis in original). This pronouncement, however, was made in response to a suggestion that the Commission give lessors of property along the rail line the right of first refusal to buy the property. We do not believe that this language amounts to a declaration that a party who has invoked § 10905 may also invoke state condemnation proceedings.

Similarly, we do not believe that *Finance Docket No. 28990F, Common Carrier Status of States, State Agencies and Instrumentalities, and Political Subdivisions,* 363 I.C.C. 132 (1980), compels a different conclusion. In this proceeding the Commission exempted from regulation the acquisition by a state of rail lines approved for abandonment, when the abandonment has not been consummated. In the course of its discussion the Commission said, "When a rail line has been fully abandoned, it is no longer rail line and the transfer of the line is not subject to our jurisdiction. However, when a line has not been fully abandoned, the transfer of the line is subject to our jurisdiction." *Id.* at 135 (footnote omitted). However, the issue here is not one of ICC "jurisdiction." The fact that the Commission may not be able to regulate directly operations on a line which has been abandoned does not mean that allowing Hayfield Northern to pursue its condemnation action will not substantially frustrate Congress's objectives in enacting § 10905.

Hayfield Northern also relies on language appearing in *Chicago & North Western Transportation Co. v. United States,* 678 F.2d 665 (7th Cir.1982), in which the Seventh Circuit agreed with the Commission that in determining fair market value in connection with a sale price under § 10905(f)(1)(A), the value of the property for nonrail purposes was the relevant value. In discussing the abandonment procedures set out in the previous version of § 10905,[8] the court indicated that a potential offeror "could . . . wait till the line was abandoned and then reacquire it [by eminent domain] at its nonrail value—or even condemn it before abandonment . . . ." *Id.* at 667. This statement is only a dictum, and does not show that the Seventh Circuit, on full briefing and consideration, would hold that state condemnation laws are consistent with the purpose of § 10905. For reasons we have already given, we are persuaded that state condemnation for purposes of continued rail service is not consistent with that statute's aim.

## VI.

Accordingly, the judgment of the District Court is affirmed, and the cause is remanded to the District Court for a determination of the amount of damages due CNW on account of delay. The stay previously entered by this Court will be dissolved when our mandate issues.

---

**8.** 49 U.S.C. § 1a(6)(a) (1976), recodified as 49    U.S.C. § 10905(b) (Supp. II 1978).